Docket No. 98942.

# IN THE
# SUPREME COURT
# OF
# THE STATE OF ILLINOIS

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. RICARDO HARRIS, Appellant.

*Opinion filed February 1, 2007.*

JUSTICE BURKE delivered the judgment of the court, with opinion.

Chief Justice Thomas and Justices Freeman, Fitzgerald, Kilbride, Garman, and Karmeier concurred in the judgment and opinion.

## OPINION

Following a jury trial in the circuit court of Cook County, the defendant, Ricardo Harris, was convicted of the first degree murders of Dipak Patel and Ambalal Patel, the attempted first degree murder and aggravated battery of Christina Chisnick, and the aggravated battery of Helen Chisnick. At a separate sentencing hearing, the same jury found defendant eligible for the death penalty for having murdered two or more individuals. The jury also concluded, after weighing the factors in aggravation and mitigation, that death was the appropriate sentence. Defendant was sentenced to death for the murders of Dipak and Amalal Patel and to consecutive 30-years terms of imprisonment for the attempted murder of Christina Chisnick and the aggravated battery of Helen Chisnick. Defendant's death sentence has been stayed pending direct review by this court. Ill. Const. 1970,

art. VI, §4(b); 134 Ill. 2d Rs. 603, 609(a). For the reasons that follow, we affirm defendant's convictions and sentences.

Background

Evidence at trial established the following. On May 13, 1999, at approximately 7:25 p.m., the Oak Lawn police department received a report of a shooting at the Extra Value liquor store on Cicero Avenue in Oak Lawn, Illinois. A dispatch was sent out and police officers proceeded to the store. Once inside, the officers discovered that four persons had been shot. Dipak Patel, the store manager, was found lying on the floor, bleeding and struggling to get up. He had been shot once in the back. Christina Chisnick, a customer in the store at the time of the shooting, was found lying on her back in a store aisle. She had been shot twice, once in the abdomen and once in the groin. Christina's sister, Helen Chisnick, was kneeling over Christina, applying pressure to her wounds. Helen had been shot once in the abdomen. In the rear of the store, the officers discovered another employee, Ambalal Patel, seated on the floor and leaning against some shelves. He had been shot once in the chest.

The police officers called for medical help and secured the store. Paramedics arrived and transported the four victims of the shootings to the hospital. Both Dipak and Ambalal died from their wounds. Christina and Helen survived.

At trial, Christina testified about the events that took place on May 13, 1999. Christina stated that she and her sister drove to the Extra Value liquor store at approximately 7:15 p.m. When they arrived, no other cars were in the store's parking lot. As the two sisters entered the store, Dipak Patel was standing behind the front counter, talking with Ambalal Patel. No other customers or employees were present. The sisters looked at various items, then moved toward the back of the store, where there was an aisle of refrigerated coolers containing cases of beer. Ambalal approached the women and spoke with them for a few moments. Christina then opened the door to one of the coolers, removed a case of beer, and turned.

Christina testified that, as she turned, she saw an African-American man, whom she identified in court as defendant, and Dipak walking toward the back of the store at the end of the cooler aisle.

Defendant was about a foot and a half behind Dipak and was holding a gun. Christina stated that, as the two men were walking, defendant shot Dipak in the back. Defendant then turned and fired once in the direction of Ambalal, who was standing behind Christina. Defendant then shot Christina twice. Christina testified that the force of the second shot spun her around. As she turned, she saw Ambalal, halfway into a shelf, his chest covered with blood. Christina then fell to the ground.

Helen Chisnick offered testimony similar to Christina's. Helen stated that, at the time of the shootings, she was standing in the cooler aisle, facing Christina. As Christina removed the beer from the cooler, Helen heard a gunshot, and immediately saw that Ambalal had been shot. Helen looked at Christina and watched as she was shot and fell to the floor. Helen then turned to look in the direction from which the shots were fired and saw a man, whom she identified in court as defendant, standing about five feet from her. Helen also saw Dipak lying on the floor and knew that he had been shot. Helen stated that she looked defendant "right in the face," looked at him "up and down," and saw that he was holding a gun in his right hand. Helen testified that she looked at defendant for approximately five seconds. Defendant then shot her. Helen testified that she threw her purse across the aisle and fell to the floor, where she pretended to be dead.

Helen stated that, after a few seconds, she saw her sister's leg move. Helen whispered to Christina to stop moving because the gunman might still be in the store. A few more seconds passed, and Helen and Christina both stood up. Helen stated that she walked toward the front of the store, saw a young blond woman at the front counter, and told her to phone the police. Helen then returned to her sister. Christina said she was growing weak and lay down on the floor. Helen knelt over Christina, applied pressure to her wounds, and began praying. Police and paramedics arrived and both women were taken to the hospital.

Both Christina and Helen testified that they did not see defendant enter or leave the store. The sisters agreed that defendant shot Dipak first, followed by Ambalal, then Christina and, finally, Helen. Both women also testified that defendant never spoke during the shootings. As Christina stated, "He just came in and shot us."

Oak Lawn Police Detective Michael Murray briefly interviewed Helen in the hospital emergency room during the evening of May 13, 1999. Both Helen and Murray testified that Helen was being treated for her injuries at the time, that medical personnel were moving around her, and that Murray stood off to one side. Helen testified she told Murray that the person who shot her was a black male, 5 feet 11 inches tall, that he weighed 170 pounds, and that he was wearing black pants, black shoes, and a black, long-sleeved shirt or jacket. In his testimony, Murray recalled Helen describing the offender as 5 feet 7 inches tall.

Murray interviewed Helen in the hospital at greater length the next day and, with Helen's assistance, prepared a composite sketch of the gunman. Both Helen and Murray agreed that, during this second interview on May 14, 1999, Helen described the gunman as 5 feet 11 inches, 170 pounds, and between the ages of 35 and 40. At the time of trial, approximately five years after the murders, defendant was 6 feet 0 inches tall and weighed 185 pounds.

On May 15, 1999, Murray and a second detective visited Helen in her home and showed her a photo array containing six pictures, including one of defendant. Helen selected defendant's photograph because, as she stated, "that is who shot me." On cross-examination, Helen acknowledged that she told the officers she was 70% certain about her selection. However, she explained her answer by stating that she wanted to see the man in the photograph in person and that "it wasn't a picture that shot me. It was a real person that shot me." After Helen selected defendant's photograph from the photo array, she signed and dated it.

On August 7, 1999, Helen viewed a lineup at the Oak Lawn police station. Helen acknowledged that, by this time, she had twice seen television programs about the shooting at the liquor store. She stated, however, that the television programs did not influence her viewing of the lineup. At the lineup, the police officers told Helen that after she looked at each person she could ask to see anyone a second time. The men stood in a line and approached the viewing window individually. Helen testified that, after viewing all the men, she knew that the first person in the lineup, defendant, was the one who had shot her. She stated that she asked to have defendant step forward a second time so that he would know she had identified him. Then, according to an

officer present during the lineup, Helen said, "I think it's number one." However, Helen testified that she told the police officers "it is number one." She also told the jury that she "picked him because that's who shot me" and that she was "positive" defendant was the man who shot her.

Christina also testified regarding interviews she had with the police. Christina stated that she briefly spoke to a uniformed officer in the emergency room on May 13, 1999, before undergoing surgery. Christina testified that she told the officer that the gunman was 5 feet 9 inches and in his mid-thirties. She also stated that he wore a black shirt, black pants, and black shoes, and had short black hair in a natural, afro hairstyle.

On May 23, 1999, Detective Murray visited Christina while she was still recovering in the hospital. Murray showed Christina an array of six photographs, including pictures of both defendant and his brother. Christina testified that, because of her medical condition, she had not seen any other pictures or media coverage related to the case before she was shown the photo array. Christina selected defendant's photograph. In his testimony, Detective Murray recalled Christina telling him during the interview on May 23 that she did not get a good look at the gunman's face but that she recognized the shape of defendant's head and his hairstyle. However, in her testimony, Christina denied saying that she did not get a good look at the gunman's face. Christiana agreed that she had commented on the shape of the gunman's head and hairstyle, but stated that she also recognized defendant's "big round eyes," "close ears" and complexion when she selected his photograph.

Like Helen, Christina viewed a lineup at the Oak Lawn police station on August 7, 1999. Prior to the lineup, she twice saw the photograph of defendant she had selected from the photo array on television programs. During the lineup, Christina identified defendant as the man who shot her. Also like Helen, Christina stated that she was certain of her identification of defendant as the gunman. Christina told the jury that defendant was standing directly in front of her when he began shooting and that the sight of him was "branded in [her] memory."

Dr. Otto MacLin, an experimental psychologist, offered expert opinion concerning the reliability of eyewitness identifications. MacLin

discussed a phenomenon known as the "weapons focus effect," in which a victim may focus his attention on the weapon used to commit the crime rather than the offender's face. According to MacLin, a body of academic literature indicates that when a weapon is involved in a crime there "is a detriment or diminished capacity to recognize" the offender. MacLin acknowledged, however, that it is difficult to confirm this effect through experimentation because of the impossibility of creating a laboratory experiment which mirrors an actual crime involving a weapon. MacLin also acknowledged that some people do make accurate identifications despite the presence of a weapon.

MacLin also described the "cross-race effect," a phenomenon in which a person may have difficulty identifying a person of another race. MacLin acknowledged, however, that some cross-racial identifications are accurate.

Jeffrey Parise, a firearms expert, testified for the State. Parise stated that he examined an unfired cartridge, a spent bullet, and five cartridge casings recovered from the floor of the Extra Value liquor store. He also examined a bullet that had been removed from Dipak during his autopsy, and a bullet that had been removed from Christina during surgery. Parise testified that the three bullets he examined were .40-caliber, jacketed, Hydrashock hollow-point bullets, a distinctive type of ammunition that is manufactured only by the Federal Company. He also stated that the bullet recovered from Ambalal's body and the bullet found on the liquor store floor were fired from "one gun to the exclusion of all others." Parise further testified that the cartridge cases recovered from the store could have been fired from the same gun. In addition, each cartridge had an elliptical impression left on it from the firing pin. According to Parise, only the Glock Company manufactures a .40-caliber handgun that leaves the type of impression found on the cartridge cases recovered from the liquor store.

Pauline Zelko, a deputy sheriff from Genesee County, Michigan, testified on behalf of the State. Zelko stated that defendant was in her custody on May 7, 1999, six days before the shooting. On that date, defendant took Zelko's firearm and escaped. Zelko's firearm was a .40-caliber, semiautomatic Glock handgun. The gun was loaded with

13 rounds of .40-caliber, jacketed, Federal Hydrashock hollow-point ammunition.

Frank Sarelli also testified for the State. In May 1999, Sarelli was living in the Aloha Motel on Cicero Avenue, five blocks from the Extra Value liquor store. Sarelli stated that he met defendant at the Aloha Motel on May 11. On May 12, Sarelli sold crack cocaine to defendant. Defendant then told Sarelli that he wanted to sell a gun. According to Sarelli, defendant showed him a black, .40-caliber, Glock handgun and said he wanted $200 for it. Sarelli called various drug dealers but was unable to sell the gun for him.

Sarelli testified that, on Thursday, May 13, 1999, defendant came to his room at approximately 11 a.m, asking for more cocaine. At that time, defendant told Sarelli that his brother and cousin were coming into town from Michigan, that they might want the gun, and that he was no longer interested in selling it. The shootings at the Extra Value liquor store occurred during the evening of May 13. Sarelli stated that he did not see defendant on May 14.

On May 15, 1999, Sarelli phoned the Oak Lawn police department and told them he had information about the shootings. Sarelli then went to the police station and told them about defendant and the gun he had been shown. Based on this information, and information obtained at the Aloha Motel, the Oak Lawn police department was able to obtain a picture of defendant from authorities in Michigan. This picture was subsequently placed in the photo arrays shown to Helen and Christina Chisnick.

During his cross-examination, Sarelli acknowledged that he was a drug and alcohol abuser with prior criminal convictions. He also acknowledged that he expected to receive a reward of $2,500 if defendant was convicted. Sarelli stated that the offer of the award was made four years after the murders, in 2003, by Oak Lawn police officers. At that time, Sarelli was in prison in Danville, Illinois, and was scheduled to be transferred to Stateville prison so that he could testify in the instant case. Sarelli did not like conditions in Stateville and was angry about the transfer. Sarelli told the Oak Lawn police officers that he would not cooperate and that they were wasting their time. At that point, the officers mentioned the reward.

On redirect, Sarelli testified that he did not know about any reward when he first phoned the police on May 15, 1999. He stated

that he came forward with information about defendant because he knew Dipak and Ambalal, had been in their store many times, and was upset by their deaths. Sarelli also testified that the State's Attorney had not offered him anything for his testimony and that his testimony was not being given solely to collect the reward money.

During the redirect examination of Sarelli, the State also introduced a tape recording of the phone call Sarelli made to the Oak Lawn police on May 15, 1999. In that recording, Sarelli told the police "somebody in–in the area over there, a black guy, tried to sell me a 40 caliber semiautomatic pistol. It was a Glock. A Glock 40 caliber semiautomatic pistol, 13 shot clip." As the State later argued to the jury, the tape recording was significant in establishing Sarelli's credibility because ballistics tests had not yet been conducted on May 15 and, at the time Sarelli called, the police did not yet know the make of the weapon used in the shootings. Thus, the tape recording showed that Sarelli was the first person to report to the police that a Glock handgun had been used to commit the murders and that the gun had a 13-shot clip.

Following closing arguments, the jury returned guilty verdicts against defendant for the first degree murders of Dipak Patel and Ambalal Patel (720 ILCS 5/9–1(a)(1) (West 2004)); the attempted first degree murder (720 ILCS 5/8–4, 9–1 (West 2004)) and aggravated battery (720 ILCS 5/12–4.2(a)(1) (West 2004)) of Christina Chisnick; and the aggravated battery (720 ILCS 5/12–4.2(a)(1) (West 2004)) of Helen Chisnick.

At the eligibility phase of the death penalty hearing, the State introduced defendant's birth certificate and certified copies of conviction for the first degree murders of Dipak and Ambalal Patel. The jury found defendant eligible for the death penalty for having murdered two or more individuals. 720 ILCS 5/9–1(b)(3) (West 2004).

At the aggravation-mitigation phase of the death penalty hearing, the State introduced further details regarding defendant's escape from Deputy Sheriff Pauline Zelko in Michigan. The escape occurred after Zelko transported defendant from the county jail to a doctor's office in Flint, Michigan. While Zelko was replacing defendant's shackles, defendant pushed Zelko's head into his groin, leaned over her back, and grabbed the deputy's gun. Defendant turned the gun on a doctor

and started to flee. He then returned to Zelko, put the gun to her head and said, "Bitch, give me the keys to the car." Zelko gave defendant the keys. Defendant then fled with Zelko's gun and car.

Patricia Lazzio, a former Genesee County, Michigan, prosecutor, described the charges that were pending against defendant at the time he escaped from Zelko. In separate cases, defendant was facing three counts of armed robbery, a "felony firearm" count and a "felon in possession" count. He was also charged with resisting and obstructing a police officer. Lazzio stated that, because of his record, the State of Michigan had refused to plea bargain with defendant. In addition, all pending charges against defendant had been consolidated and a trial date had been set for May 19, 1999. Lazzio also testified that the State of Michigan was seeking a life sentence for defendant on the ground that he was an habitual offender and that defendant had been informed of this fact.

Lazzio stated that one of the incidents for which defendant was facing charges was the robbery of a convenience store in Flint, Michigan, on October 7, 1998. In this incident, the robber entered the store, reached across the counter and grabbed the store clerk's clothes around his neck. He then held a knife with a six- to seven-inch blade to the clerk's throat and demanded money. The clerk identified defendant as the robber from a photo lineup and defendant was subsequently arrested. The armed robbery was also recorded on a video surveillance tape, which was played for the jury during the sentencing hearing in the case at bar.

Lazzio stated that defendant was also facing charges for a second armed robbery that occurred in Flint, Michigan, in the early morning hours of October 14, 1998. In this incident, the robber entered a convenience store and pulled out a .357 Magnum from his waistband. He pointed the gun at a clerk's head, cocked it, and said, "Give me the cheese." He then pointed the gun at a customer and indicated that he was ready to shoot him, too. The robber took the money from the store's register and left. Following a chase on foot, police officers apprehended defendant in a nearby area. They also recovered a loaded, long-barrel, .357 Magnum that defendant had tried to discard during the chase. After defendant was taken to the police station, he admitted to police officers that he had robbed the store. Then, while in a holding area, defendant struck a police officer in the head,

wrestled with him on the ground, and tried to grab the officer's gun. With the help of additional officers, defendant was eventually subdued.

Evidence of other crimes defendant committed in Michigan was also introduced. Defendant was convicted of breaking and entering into an occupied dwelling in 1986 and was sentenced to a prison term of 5 to 15 years. In 1988, defendant was seen in a stolen car and fled when a police officer approached the vehicle. Defendant was subsequently convicted of unlawfully driving away an automobile and received a prison term of two to five years. In 1989, defendant was convicted of attempted felony receiving and concealing of stolen property. He received a sentence of one to two years' imprisonment.

Defendant was incarcerated in Michigan in August of 1989 and paroled in June of 1993. His parole was revoked, and he was reincarcerated, in October of 1994. He was released again in August of 1996, and his parole revoked a second time, in March of 1997. Defendant was paroled a third time in February of 1998. By March of 1999, he had been charged with armed robbery and the other crimes for which he was facing trial on May 19, 1999.

Evidence was also introduced at defendant's sentencing hearing regarding an armed robbery that occurred at a convenience store in Charlotte, North Carolina, on July 21, 1999. In this incident, the robber reached over the counter, grabbed the clerk and threatened to shoot and kill him if he did not open the cash register drawer. The clerk opened the drawer and the robber took the money. This incident was also recorded on a video surveillance tape that was played for the sentencing jury in the case at bar. After the videotape was recovered by the police, it was released to the media and broadcast on a television program called "Crime Stoppers." Defendant was arrested by the FBI in Charlotte on August 4. The store clerk subsequently identified defendant as the robber from a photo array.

Dipak Patel's son, Chirayu Patel, concluded the State's case in aggravation by reading a victim impact statement to the jury.

No evidence was offered by defendant in mitigation. Defendant refused to attend his sentencing hearing, did not cooperate with trial counsel in the preparation of mitigating evidence, and declined to testify on his own behalf.

Following argument by the State and defense, the jury concluded that death was the appropriate sentence for the murders of Dipak and Ambalal Patel. The judge subsequently sentenced defendant to death for the first degree murders and imposed consecutive 30-year terms for the remaining convictions. This appeal followed.

Analysis

Defendant raises 10 issues on appeal, relating to both his trial and sentencing. We address these issues in turn.

*Defense Counsel's Use of the Word "Jail"*

Prior to trial, the State filed a motion *in limine* seeking to admit evidence that defendant had escaped from custody in Michigan six days before the shootings at the Extra Value liquor store and had taken Deputy Sheriff Zelko's .40-caliber Glock handgun. In its ruling on this motion, the circuit court stated that the evidence tended "to aid in the identification of the perpetrator of the subject crimes in that it shows that the Defendant had access to or possession of a handgun, or the .40 caliber Glock he's alleged to have stolen from the Sheriff's Deputy, which is similar to the handgun used in the liquor store crimes." The circuit court conducted a balancing test and concluded that the probative value of the evidence substantially outweighed its potential prejudicial effect. Accordingly, the court granted the State's motion to admit the evidence.

At the same time, however, the circuit court also ruled that the evidence of defendant's escape "must not become the focal point of the trial." To that end, the court ordered that the State would "be limited to establishing that the Defendant was in the custody of the Sheriff Deputy, overpowered the Deputy, and fled from the Deputy Sheriff's custody with her gun." The court further ordered that the State would not be allowed to present details of the escape from custody that were irrelevant to the identification issue, including "the fact that the defendant was a jail inmate at the time of this other offense."

Thereafter, during the course of defense counsel's opening statement to the jury, counsel stated that "a person by the name of Ricardo Harris had escaped from a jail in Michigan and he had

-11-

escaped with a gun." In the next sentence, counsel again stated, "Ricardo Harris did escape from a jail in Michigan." Later, during the cross-examination of Deputy Sheriff Zelko, defense counsel elicited testimony that defendant was wearing "jail-jump greens" at the time of his escape. The court sustained an objection by the State to the use of the word "jail-jumps" but did not inform the jury that the objection was sustained.

Before this court, defendant argues that defense counsel's use of the word "jail" during his opening statement, and the elicitation of the word "jail-jumps" from a witness, amount to ineffective assistance of counsel. Defendant contends that defense counsel's errors revealed that defendant "had at least allegedly committed prior bad acts and that he had been arrested as a result." According to defendant, counsel's errors were prejudicial and require reversal of his convictions.

Claims of ineffective assistance of counsel are generally evaluated under the two-part test set forth in *Strickland v. Washington*, 466 U.S. 668, 687, 80 L. Ed. 2d 674, 693, 104 S. Ct. 2052, 2064 (1984) (adopted by this court in *People v. Albanese*, 104 Ill. 2d 504, 525-26 (1984)). To prevail under *Strickland*, a defendant must show that his attorney's assistance was both deficient and prejudicial. More precisely, a defendant must show that his attorney's assistance was objectively unreasonable under prevailing professional norms, and that there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 687, 694, 80 L. Ed. 2d. at 693, 698, 104 S. Ct. at 2064, 2068. The failure to satisfy either prong of the *Strickland* test will preclude a finding of ineffective assistance of counsel. *People v. Shaw*, 186 Ill. 2d 301, 332 (1998).

In this case, defendant has not established prejudice. As noted, in its ruling on the motion *in limine*, the circuit court held that the State could introduce evidence that defendant escaped from the custody of Deputy Sheriff Zelko. Defendant does not contest this ruling. Thus, defendant's contention regarding prejudice is quite narrow: he contends he was prejudiced by the statements that he escaped from custody in jail rather than from the custody of a deputy sheriff. This is a *de minimis* distinction. The jury knew that defendant was in

-12-

custody and could infer, logically, that he was being held in custody somewhere. Further, on the three occasions when the word "jail" was mentioned it was not stressed or emphasized in any way. Finally, and most important, the three mentions of the word "jail" occurred within the context of a lengthy trial in which the jury heard extensive ballistics evidence as well as the compelling testimony of two eyewitnesses who repeatedly and unequivocally identified defendant as the gunman. Given these facts, we conclude there is no reasonable probability that, absent the appearance of the word "jail" and "jail-jumps," the result of defendant's trial would have been different. Accordingly, defendant's claim of ineffective assistance of counsel fails.

*Defendant's Flight to and Arrest in North Carolina and His Use of an Assumed Name*

Before trial, the State moved *in limine* to introduce evidence that defendant fled to Charlotte, North Carolina, following the shootings at the Extra Value liquor store and that, at the time of his arrest there in August of 1999, he possessed identification bearing a false name. During the hearing on the State's motion, the State argued that both defendant's flight and his use of an assumed name were relevant and admissible because they showed defendant's consciousness of guilt for the crimes committed in Illinois. The State asked the circuit court to "allow the People to make [this] argument to the ultimate trier of fact."

In the alternative, the State contended that, if the circuit court did "not allow the People to make this argument to the trier of fact, that being flight and consciousness of guilt," then evidence that defendant was apprehended in North Carolina and was carrying false identification was nevertheless admissible to show the circumstances of his arrest. In particular, citing to *People v. Hayes*, 139 Ill. 2d 89, 130-31 (1990), the State maintained that evidence of defendant's arrest in North Carolina was admissible to explain why his apprehension was delayed until three months after the crimes occurred.

Following the hearing on the State's motion, the circuit court issued an order in which it reserved ruling on whether the State would be allowed to argue that defendant's flight to North Carolina showed

consciousness of guilt. In its order, the circuit court set forth a "framework for a future determination of the issue," explaining:

> "The inference of guilt which may be drawn from flight depends upon the knowledge of the suspect that the offense has been committed and that he is or may be suspected. While evidence that the Defendant was aware that he was a suspect is essential to prove flight, actual knowledge of his possible arrest is not necessary to render sufficient evidence admissible where there is evidence from which such fact may be inferred."

The circuit court invited the State "to submit a pre-trial proffer of the evidence that it would advance at trial that would show that the Defendant had knowledge that the charged liquor store crimes had been committed and that he was aware or [*sic*] may have been suspected." Thereafter, however, the State expressly declined to make such a proffer and no further order was entered by the court on this issue.

With respect to defendant's possession of false identification at the time of his arrest, the circuit court granted the State's motion *in limine*. The circuit court stated:

> "Where the Defendant uses a different name from his own, questioning regarding the defendant's true identity is relevant in that it serves to clarify the Defendant's true identity. Identification is clearly an issue in this case and evidence of the Defendant's use of an assumed name is equally clearly relevant and material to the issue of the identity of the offender. Also, evidence of the use of a false name after the commission of a crime is commonly accepted as relevant and admissible as to the issue of consciousness of guilt."

Subsequently, at trial, the State introduced the testimony of FBI Agent Raymond Duda. Duda briefly testified, without cross-examination, that he arrested defendant inside an apartment in Charlotte, North Carolina, on August 4, 1999. Duda stated that, at the time of his arrest, defendant possessed a social security card and a North Carolina state identification card bearing defendant's photograph. Both cards were in the name of Joaquin Alexander McCall.

In addition to Duda's testimony, the State also briefly referred to defendant's arrest in North Carolina and his use of an assumed name during its opening statement to the jury. And, during closing argument, the prosecutor twice stated that defendant was using the name Joaquin McCall at the time of his arrest.

Defendant now contends that the circuit court erred in admitting evidence of defendant's flight to and arrest in North Carolina and his use of an assumed name. Defendant casts his argument solely in terms of whether it was proper for the State to use this evidence to establish his consciousness of guilt for the crimes at issue in this case. Defendant acknowledges, as a general matter, that both evidence of flight and the use of an assumed name may be admissible as proof of consciousness of guilt. See, *e.g.*, *People v. Lewis*, 165 Ill. 2d 305, 349 (1995); 2 K. Broun, McCormick on Evidence §263, at 217 (6th ed. 2006); M. Graham, Cleary & Graham's Handbook of Illinois Evidence §801.3, at 632 (8th ed. 2004). Defendant maintains, however, that to establish consciousness of guilt from flight and the use of an assumed name, the State must show that the defendant knew he was being sought in connection with the charged crime. Further, while defendant concedes that there was "massive" nationwide publicity regarding the shootings at issue in this case, he maintains that the State's own evidence establishes that defendant left immediately after the crimes at the liquor store occurred and that he "was no longer in Oak Lawn when the publicity barrage began." According to defendant, "[n]ot only did the state fail to establish that [defendant] knew he was a suspect, it established that he left before he could have known that the police suspected him." Thus, defendant contends that "[t]he state failed to lay the foundation necessary to admit evidence that [defendant] had fled to and was arrested in North Carolina or that he was using an assumed name, and it was improper to argue that was evidence of his consciousness of guilt."

The State, in response, correctly observes that this argument is procedurally defaulted because defendant failed to include it in his posttrial motion. See *People v. Enoch*, 122 Ill. 2d 176, 186 (1988). Nevertheless, pursuant to Supreme Court Rule 615(a) (134 Ill 2d R. 615(a)), "[p]lain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the trial court." Before invoking the plain error exception, however, "it is

appropriate to consider whether error occurred at all." *People v. Wade*, 131 Ill. 2d 370, 376 (1989). The circuit court errs in admitting evidence only if it abuses its discretion in doing so. *People v. Robinson*, 217 Ill. 2d 43, 62 (2005).

With respect to the issue of flight, we note that, contrary to defendant's assertions, the State did not attempt to establish his consciousness of guilt based on the fact he fled to North Carolina. Although the State argued in pretrial proceedings that defendant's flight showed consciousness of guilt, the argument was not pursued at trial. At no time did the State suggest to the jury that defendant fled to North Carolina because he was conscious of having committed the crimes at issue in this case.

Through the testimony of Agent Duda the State did introduce evidence that defendant was arrested in North Carolina. However, the State's only noteworthy mention of defendant's arrest came during its opening statement to the jury, where the prosecutor suggested there was a delay in apprehending defendant because he was in North Carolina:

> "The Oak Lawn police were now looking for Ricardo Harris; but ladies and gentlemen, their search didn't really turn up much–not until August 4, 1999, when the defendant was captured and arrested by the FBI. He was found in North Carolina. He was found living under an assumed name. He was found in possession of identification under that assumed name, but with his photograph on it."

Evidence that defendant was apprehended in North Carolina was clearly admissible as a circumstance of his arrest. *People v. Hayes*, 139 Ill. 2d 89, 130-31 (1990). We conclude, therefore, that the circuit court did not abuse its discretion in admitting that evidence. Consequently, we also conclude there was no plain error. See *People v. Keene*, 169 Ill. 2d 1, 17 (1995) (all plain errors are reversible errors).

With respect to the false identification discovered with defendant at the time of his arrest, we note that the circuit court offered two rationales for its admission: the evidence was relevant to establishing defendant's identity and it was relevant to establishing his consciousness of guilt. In two statements made during closing argument, the State discussed defendant's use of an assumed name,

but solely in terms of clarifying defendant's identity. The first statement came while the prosecutor was recounting Agent Duda's description of defendant and emphasizing the accuracy of the composite sketch of the gunman prepared by Helen Chisnick:

> "What did [Duda] say about the defendant's weight? What did he say about him? Oh, I know, he said that he had the identifications, evidently he's Joaquin McCall. That's right, he's Joaquin McCall. But we'll call him Ricardo Harris today, okay, folks. But what did he say about him besides that he was Joaquin McCall on that day? He said that he was six foot, a hundred and eighty-five pounds. Boy, everything Helen had to say about him is actually right on. The composite [sketch] was right on, the weight and the height, everything is right on about the defendant."

During rebuttal, the prosecutor again mentioned the assumed name within the context of discussing Helen's identification of defendant:

> "And what about that information [which Helen provided to the police]? Special Agent Duda told you that when Ricardo Harris was taken into custody in North Carolina, he was six foot tall, one inch different [than Helen's description], hundred and eighty-five pounds, fifteen pounds heavier [than Helen's description], and going under the name of Joaquin McCall. You can read it. It's got the information on there. Alexander McCall. And issued June 1st, 1999. You will be able to see that."

The State discussed defendant's assumed name only to clarify that, although the identification found on defendant bore the name Joaquin Alexander McCall, it was, in fact, defendant who was arrested, and further, that it was defendant's physical description which was on the North Carolina state identification card. Evidence of defendant's use of an assumed name served to clarify defendant's true identity. As such, it was properly admitted. See, *e.g.*, *People v. Berlin*, 75 Ill. 2d 266 (1979).

In his briefs to this court, defendant does not address the circuit court's ruling that the false identification was relevant to establishing his true identity but, instead, asserts only that the State introduced his use of an assumed name to prove his consciousness of guilt. Again,

however, the State did not make that argument to the jury. Further, even if the admissibility of the false identification is viewed solely in terms of establishing consciousness of guilt, and even if it is considered under the standards for admission suggested by defendant, there was no error.

In a supplemental *pro se* response to the State's motion *in limine*, defendant admitted that he knew he was a suspect in the shootings "days" after they occurred. The *pro se* response states:

> "[D]efendant did not become a suspect in the crime until May 15th which is when police learned of his identity. The defendant was totally unaware of an armed robbery having taken place, or of him having become a suspect until days later."

During the hearing on the State's motion *in limine*, defendant again told the court, "I didn't know anything about any crime here in Illinois until subsequently after leaving this State. Which was a couple days later."

Defendant expressly conceded to the circuit court that, at the time the State established he was using an assumed name, *i.e.*, when he was arrested in August of 1999, he knew he was a suspect in the crimes at issue in this case. Given these facts, we conclude that the circuit court did not err in admitting evidence of defendant's use of false identification, either as a matter of establishing defendant's identity or his consciousness of guilt. Consequently, we find no plain error as well.

### *Evidence That Defendant Purchased and Used Drugs*

Before trial, defendant moved *in limine* to exclude any testimony by Frank Sarelli that defendant purchased or used drugs with Sarelli during the time defendant was staying at the Aloha Motel. The circuit court denied the motion.

Subsequently, at trial, Sarelli testified regarding drug sales made to defendant. Sarelli stated that when he first met defendant at the Aloha Motel on May 11, 1999, defendant asked Sarelli where he could buy drugs. Sarelli went to defendant's room and allowed defendant to try some of his crack cocaine. Defendant then asked Sarelli if he would buy him some crack cocaine. Sarelli did so. Sarelli

also testified that he bought crack cocaine twice more for defendant on the following day, May 12. According to Sarelli, after the second drug purchase on May 12, defendant showed him a Glock, .40-caliber handgun and asked whether Sarelli could sell it for him.

Before this court, defendant states that the circuit court admitted Sarelli's testimony regarding the drug sales and drug usage because the testimony placed defendant five blocks from the Extra Value liquor store around the time of the shootings. Defendant contends, however, that it is improper for a witness to discuss other crimes to establish a defendant's proximity in time and place to the crime scene. Defendant further claims that Sarelli could have testified that he had seen defendant at the Aloha Motel without mentioning the drug sales or drug usage, and "no violence would have been done to his testimony." Accordingly, defendant maintains that Sarelli's testimony regarding the drug sales and drug usage was irrelevant and prejudicial and should have been excluded. We disagree.

"[E]vidence of other crimes committed by defendant may be admitted if relevant to establish any material question other than the propensity of the defendant to commit a crime." *People v. Stewart*, 105 Ill. 2d 22, 62 (1984). "When such evidence is offered, it is incumbent upon the trial judge to weigh the relevance of the evidence to establish the purpose for which it is offered against the prejudicial effect the introduction of such evidence may have upon the defendant." *Stewart*, 105 Ill. 2d at 62.

Contrary to defendant's assertions, Sarelli's testimony regarding drug sales and drug usage was not admitted solely because of its relevance to establishing defendant's proximity to the crime scene. During a brief hearing on defendant's motion *in limine*, the State contended that the drug transactions between defendant and Sarelli were relevant and admissible because they showed "the credibility of the relationship between Mr. Sarelli and the defendant." The State explained:

> "[I]t is our position that it is because of that relationship, because of the relationship that Mr. Sarelli had with the defendant in that he would buy the drugs for the defendant and do drugs with the defendant, that the defendant felt comfortable enough to show Mr. Sarelli the gun that he was

in possession of and felt comfortable enough to ask Mr. Sarelli to try and sell that gun."

Immediately following the State's argument, the circuit court issued a ruling on defendant's motion in which the court agreed with the State:

> "The Court finds that the witness'–that is, Frank Sarelli supplying drugs to the defendant and the presence together of the defendant and the witness for the negotiation of the purchase of drugs and the usage of the drugs *puts into context the relationship and the extent and nature of the time the two spent together* and speaks to the witness' opportunity to observe the defendant and clearly goes to the issue of the defendant's identification and presence and proximity to the crime scene.
>
> The Court has conducted a balancing test and finds that the probative value from the admission of this evidence would substantially outweigh its prejudicial effect.
>
> Therefore, your motion in limine is denied and the evidence may come in." (Emphasis added.)

The jurors were more likely to believe that defendant tried to sell Sarelli the Glock handgun if they knew the nature of the relationship between the two and, specifically, that Sarelli had shared drugs with defendant and had obtained drugs for him on at least three occasions. See, *e.g.*, *People v. Cole*, 29 Ill. 2d 501, 504-05 (1963) (evidence of prior drug transactions explained and gave credence to what was otherwise unrealistic testimony regarding a drug sale between the defendant and an undercover officer). The circuit court did not abuse its discretion in admitting evidence of the drug transactions on this basis.

*References to the Victims' Families*

Defendant contends that the State impermissibly elicited references to the victims' families during the trial testimony of three witnesses. The first such reference occurred during the direct examination of Helen Chisnick. At the beginning of her testimony, Helen was asked several background questions by the prosecutor, including how old

-20-

she was and what she did for a living. Helen was then asked what she did on May 13, 1999, the day of the shootings. Helen replied:

> "I took care of my mother. My mother was bedridden. She'd had a stroke. So she was paralyzed on the one side of her. So I–my routine would be I would get up in the morning. I would have to change her, feed her breakfast, test her blood sugar."

The second reference that defendant contends was error took place during the testimony of Christina Chisnick. At the beginning of her direct examination, Christina was also asked several background questions, including whether she was married and whether she had any children. Helen answered that she was married and that she had a nine-year-old son.

The third reference occurred during the testimony of Barul Patel, Dipak Patel's wife. Testifying primarily as a "life and death" witness for the State, Barul stated that she opened the Extra Value liquor store with her husband at 9 a.m., left to pick up her younger son from school in the afternoon, and returned in the evening to find that the shootings had taken place and that her husband had been taken to the hospital. Like Helen and Christina, Barul was asked several background questions at the beginning of her direct examination, including whether she was married, whether she had any children, and what the ages of the children were. Barul answered that she was married to Dipak and that she had two sons who, at the time of trial in February 2004, were 21 and 16 years old.

Citing to *People v. Hope*, 116 Ill. 2d 265, 274-79 (1986), and *People v. Bernette*, 30 Ill. 2d 359, 371 (1964), defendant contends that the references to family members of the victims described above were improperly elicited by the State in an attempt to appeal to the emotions of the jurors. He maintains that he was denied a fair trial on this basis and, therefore, that his convictions should be reversed.

The State correctly observes that this argument is procedurally defaulted because no objections were made to the witnesses' testimony at trial and because defendant failed to include the issue in his posttrial motion. See *People v. Enoch*, 122 Ill. 2d 176, 186 (1988). Defendant, in response, contends that the admission of the complained of testimony amounts to plain error. In addressing defendant's plain

error argument, we first consider "whether error occurred at all." *People v. Wade*, 131 Ill. 2d 370, 376 (1989).

> "[W]here testimony in a murder case respecting the fact the deceased has left a spouse and family is not elicited incidentally, but is presented in such a manner as to cause the jury to believe it is material, its admission is highly prejudicial and constitutes reversible error unless an objection thereto is sustained and the jury instructed to disregard such evidence. In like manner, we have held that jury argument by the prosecution which dwells upon the decedent's family or seeks to relate a defendant's punishment to the existence of family is inflammatory and improper." *People v. Bernette*, 30 Ill. 2d 359, 371 (1964). "However, '[c]ommon sense tells us that murder victims do not live in a vacuum and that, in most cases, they leave behind family members.' (*People v. Free* (1983), 94 Ill. 2d 378, 415.) Thus, every mention of a deceased's family does not *per se* entitle the defendant to a new trial. (*People v. Bartall* (1983), 98 Ill. 2d 294, 322.)" *People v. Hope*, 116 Ill. 2d 265, 275-76 (1986).

In this case, several facts point to the admissibility of the three witnesses' testimony. First, unlike the testimony at issue in cases such as *Hope* and *Bernette*, Helen's and Christina's testimony did not involve the family members of a deceased victim. Rather, Helen and Christina testified as surviving victims describing their own personal backgrounds. See, *e.g.*, *People v. Wilson*, 32 Ill. App. 3d 842, 847 (1975) (rejecting argument brought under *Bernette*, in part, because the complained-of testimony did not involve family members of a deceased victim). In addition, Barul's testimony that she was married to Dipak was necessary to establish her relationship to Dipak, and her testimony that she had children was necessary to explain why she left the liquor store in the afternoon. Both statements were a relevant part of her "life and death" testimony. See, *e.g.*, *People v. Free*, 94 Ill. 2d 378, 413-15 (1983); *People v. Speck*, 41 Ill. 2d 177, 201-02 (1968), *rev'd on other grounds*, 403 U.S. 946, 29 L. Ed. 2d 855, 91 S. Ct. 2279 (1971). Finally, and most important, the brief testimony elicited by the State from the three witnesses consisted solely of introductory, background questions. The State did nothing to make it appear material to establishing guilt or innocence. Thus, the testimony was

properly admitted. See, *e.g.*, *People v. Pasch*, 152 Ill. 2d 133, 199 (1992) (rejecting challenge under *Bernette*, in part, because "many of the complained-of questions consisted of merely introductory, foundational questions pertaining to the witness' back ground, which was proper"); *People v. Griffith*, 158 Ill. 2d 476, 484-85 (1994). Consequently, there also was no plain error.

In addition to challenging the testimony of Helen, Christina and Barul, defendant also contends that he was denied a fair trial because of comments the prosecutor made about the two deceased victims' families during the opening statement to the jury. While recounting the events that took place inside the liquor store during the shootings, the prosecutor stated: "That bullet that struck Dipak in the back killed him. Dipak Patel was both a father and a husband." The prosecutor also stated: "The defendant's bullet struck Ambalal Patel in the chest killing him. Ambalal Patel was also a husband and father." A defense objection at that point was sustained and the issue was subsequently raised in defendant's posttrial motion.

We agree with defendant that the prosecutor's comments during the opening statement were error. However, we cannot say the comments were so improper as to warrant reversal of defendant's convictions. The comments were not dwelled upon by the State in any way and no attempt was made to relate defendant's punishment to the existence of the victims' family. See *Bernette*, 30 Ill. 2d at 371. Further, defense counsel's objection to the comments was sustained and the jury was properly instructed that the arguments of counsel were not evidence that it could consider in determining guilt or innocence. Considered in the context of the entire trial, the comments did not prejudice defendant. Accordingly, we conclude that the comments do not amount to reversible error.

*Excusal of Venireperson Smith for Cause*

Defendant contends that the circuit court violated the principles set forth in *Witherspoon v. Illinois*, 391 U.S. 510, 20 L. Ed. 2d 776, 88 S. Ct. 1770 (1968), when it excused prospective juror Harvey Smith for cause. The State initially responds that this argument is forfeited because defendant did not include any reference to Smith's excusal in his posttrial motion. However, the failure to preserve an error in a posttrial motion may be excused when a timely trial

objection is made and the purported error is one that can be raised in a postconviction petition. *People Keene*, 169 Ill. 2d 1, 10 (1995). Here, defendant objected when the circuit court excused Smith after his *voir dire* examination, and a *Witherspoon* error can be asserted in postconviction proceedings. See 725 ILCS 5/122–1(a)(1) (West 2004) (permitting claims of "substantial denial of *** rights under the Constitution of the United States or of the State of Illinois); *People v. Jackson*, 205 Ill. 2d 247, 271-72 (2001) (addressing a *Witherspoon* argument raised in a postconviction petition). Accordingly, defendant's procedural default is excused.

*Witherspoon* and its progeny hold that a defendant's right to an impartial jury, guaranteed by the sixth and fourteenth amendments to the United States Constitution, prohibits the removal of a prospective juror for cause where the prospective juror voices only general objections to the death penalty. *People v. Gilliam*, 172 Ill. 2d 484, 509 (1996). A prospective juror in a capital case may, however, be excused for cause based on his beliefs regarding the death penalty when those beliefs would " 'prevent or substantially impair the performance of his duties as a juror in accordance with the law and his oath.' " (Emphasis omitted.) *Wainwright v. Witt*, 469 U.S. 412, 420, 83 L. Ed. 2d 841, 849, 105 S. Ct. 844, 850 (1985), quoting *Adams v. Texas*, 448 U.S. 38, 45, 65 L. Ed. 2d 581, 589, 100 S. Ct. 2521, 2526 (1980). Because the circuit court is in a " 'superior position to gauge the meaning of the prospective juror's responses,' " the court's decision to remove a prospective juror for cause is entitled to great deference on review. *People v. Tenner*, 157 Ill. 2d 341, 363 (1993), quoting *People v. Emerson*, 122 Ill. 2d 411, 439 (1987). The remarks of a prospective juror during the *voir dire* examination must be considered "not in isolation but as a whole." *Tenner*, 157 Ill. 2d at 363. In addition, each *voir dire* is unique and the propriety of dismissing a juror for cause must be considered on a case-by-case basis. *People v. Williams*, 161 Ill. 2d 1, 54 (1994).

In this case, Smith was questioned extensively during his *voir dire* examination regarding his views on the death penalty and his ability to fairly decide defendant's case. At the close of his examination, the State moved to excuse Smith for cause. The State maintained that both Smith's responses to questioning and his physical demeanor during questioning demonstrated his substantial inability to follow the

law and perform his duties as a juror. The State noted, in particular, that Smith kept "shaking his head no" throughout the examination.

The circuit court granted the State's motion. The court stated:

"Well, the Court has been particularly mindful of this juror's responses in conjunction with his body conduct; his body language, his demeanor as he sat in the chair, and the Prosecution was correct when they said that. Even when the juror indicated that he could possibly or at one point he even got to the point of probably signing a verdict imposing death, his head was shaking from side to side in a no fashion as it had been throughout the course of this juror's voir dire. The Court finds that this prospective juror's responses and demeanor demonstrated to the Court's satisfaction that his views on the death penalty would prevent or substantially impair the performance of his duties as a juror in accordance with the Court's instructions as to the law and his oath as a juror. Accordingly, he's excused for cause."

Defendant contends that the circuit court erred in dismissing Smith because there was "no ambiguity" in Smith's answers during his *voir dire* examination. In defendant's view, Smith "repeatedly and unambiguously stated that he could follow the law and impose a death sentence." Defendant acknowledges the circuit court's finding that Smith was shaking his head "no" throughout his questioning. However, defendant contends that "[i]t simply is inappropriate to rely upon a prospective juror's demeanor to excuse him for cause where he has repeatedly and unambiguously promise[d] to follow the law." Thus, according to defendant, the circuit court erred in dismissing Smith for cause.

Unlike defendant, we believe there was considerable ambiguity in Smith's *voir dire* responses. Although, at times, Smith did state that he could follow the law as instructed, there were several instances when he stated that he could not. At the outset of Smith's examination, for example, the following exchange took place:

"Q. [by the court] Okay. Are your beliefs about the death penalty such that regardless of the facts of the case and regardless of the background of the Defendant that if the Defendant were found guilty of first-degree murder, you would automatically vote against imposing the death penalty?

A. It's a possibility.

Q. Okay. Well, can you give that some thought and be a little less equivocal. Would you be inclined to automatically vote against the death penalty regardless of–

A. Yes.

Q. –regardless of the facts of the case and regardless of the background of the Defendant?

A. Yes."

Later, the following exchange took place:

"Q. [by the court] Sir, if you believe that after hearing all of the facts, all of the aggravation, and all of the mitigation that the death penalty was the appropriate sentence, would you impose it?

A. If after I had heard everything; all the facts, and everything is there, I don't think so. This question here, man, you know, sir, I mean, your Honor, that is something there.

***

Q. *** [A]ll we want to do is make sure that you could be fair to both sides; keep an open mind in this case, set your personal beliefs about the death penalty aside, and just follow the law as I give it to you. That's all we want to do, and my question is very simple to you. Can you do that and in doing that, consider all of the sentencing options and if after hearing all of the facts, all of the aggravation, all of the mitigation, and keep an open mind in the process, you determine that the death penalty is the appropriate sentence, could you sign a verdict form to that effect?

A. Your Honor, to be perfectly honest with you, I am not 100 percent sure. I am sort of split in between. I am not 100 percent sure that I could."

Asked whether his views regarding the death penalty would substantially impair his ability to reach a fair and impartial decision concerning the issue of defendant's guilt, Smith replied, "Oh, yeah. Yeah. Yes. Yes." When asked for further clarification, however, Smith stated that he could, in fact, fairly decide defendant's guilt without regard to potential punishment.

-26-

On another occasion, when the circuit court asked Smith whether he could set his beliefs about the death penalty aside and follow the law as the court instructed, Smith replied, "Yes, Yes." Subsequently, however, he told the court that because of his religious beliefs, he was opposed to the death penalty in most situations and that he could not put the law before those beliefs. Smith also stated:

"A. Put my beliefs aside? I could hear it, but I could never put my beliefs aside and say–because what I believe in I believe in."

Finally, at the end of Smith's examination, the following exchange took place:

"Q. [by the court] *** Could you look at both of those things [the death sentence and a term of imprisonment] with an open mind and depending on the facts choose either option?

A. There's a possibility that I could look at them both with an open mind, but making a decision to choose would be maybe kind of hard. It all depends on the facts presented.

Q. It is hard, but could you do it?

A. It all depends on the facts.

Q. Right. And if you had the facts, could you do it?

A. And if those facts was true and I believe in these facts and knew I had the right facts; knowing it's the right thing and if I knew it was the right facts, then I could probably make some type of decision.

Q. Could you sign a verdict that called for the death penalty if you were satisfied with the facts in front of you and that they warranted that penalty?

A. It's a possibility. It's a possibility. I mean I would probably sign it, you know.

Q. Can you see yourself doing it under the rights facts and the right case?

A. Your Honor, like I said, if it's the facts. I have to have the facts.

-27-

Q. I know and let's assume that you have the facts that you believe are sufficient to justify the death penalty, would you sign a verdict that provided for it?

A. Possibly so, your Honor. Like I said, you know, I mean it's a hard decision for me. My own personal opinion. It's a hard decision."

As the State pointed out after this exchange had taken place, even when Smith assumed the existence of facts that he, himself, believed were sufficient to impose the death penalty, Smith still declined to say that he would sign a death penalty verdict.

It is true, as defendant argues, that at times during his *voir dire* examination Smith indicated he could follow the law and perform his duties as a juror. At other times, however, Smith's responses clearly demonstrated that he could not "set aside his own beliefs in deference to the rule of law." *Williams*, 161 Ill. 2d at 54, citing *Lockhart v. McCree*, 476 U.S. 162, 176, 90 L. Ed. 2d 137, 149-50, 106 S. Ct. 1758, 1766 (1986). "[I]t is precisely in situations such as this, where the cold record suggests an apparent contradiction, that we defer to the circuit court's discretion." *People v. Shaw*, 186 Ill. 2d 301, 317 (1998), citing *People v. Holman*, 132 Ill. 2d 128, 148-49 (1989); see also *Wainwright*, 469 U.S. at 434, 83 L. Ed. 2d at 858, 105 S. Ct. at 857.

Moreover, in making its decision whether to excuse Smith for cause, the circuit court had to consider not only Smith's ambiguous responses, but also the fact that he had been shaking his head "no" throughout the examination. " '[T]he manner of the juror while testifying is oftentimes more indicative of the real character of his opinion than his words.' " *Wainwright*, 469 U.S. at 428 n.9, 83 L. Ed. 2d at 854 n.9, 105 S. Ct. at 854 n.9, quoting *Reynolds v. United States*, 98 U.S. 145, 156-57, 25 L. Ed. 244, 247 (1879). Here, the circuit court found that Smith's demeanor indicated, along with his responses, that he was unable to perform his duties. This finding must be given deference. See, *e.g.*, *Wainwright*, 469 U.S. at 426, 83 L. Ed. 2d at 853, 105 S. Ct. at 853 ("deference must be paid to the trial judge who sees and hears the juror").

Given the nature of both Smith's responses to questioning and the circuit court's finding regarding his demeanor, we cannot say the circuit court abused its discretion in concluding that Smith's views

-28-

would have prevented or substantially impaired the performance of his duties as a juror. Accordingly, we hold that the circuit court did not err when it dismissed venireperson Smith for cause.

*Jury Question Regarding the Imposition of the Death Penalty for Two Murders*

In *Morgan v. Illinois*, 504 U.S. 719, 119 L. Ed. 2d 492, 112 S. Ct. 2222 (1992), the United States Supreme Court held that a capital defendant has a right to challenge for cause a juror who would automatically vote to impose the death penalty upon conviction. See generally *People v. Buss*, 187 Ill. 2d 144, 180 (1999). Pursuant to *Morgan*, the circuit court in this case stated, prior to *voir dire*, that it intended to ask each prospective juror the following question:

> "Are your beliefs such that regardless of the facts of the case or the background of the defendant, that if the defendant were found guilty of first degree murder, you would automatically vote to impose the death penalty, and would not consider signing a verdict which would result in a sentence of imprisonment?"

Defense counsel objected to the circuit court's question. Counsel moved to have the court's question replaced with one which asked the prospective jurors whether they would automatically impose the death penalty if the "defendant were found guilty of two murders." The circuit court denied counsel's motion, stating that the question proposed by the court was "consistent with the state of the law." Thereafter, the circuit court's question, as set forth above, was asked of each prospective juror.

Defendant contends that the circuit court erred when it declined to ask his proposed question. According to defendant, the court's refusal to ask the prospective jurors whether they would always impose a death sentence if the defendant was convicted of murdering two persons denied him his right to an impartial jury. Defendant acknowledges that this claim has been forfeited because it was not included in his posttrial motion. Defendant maintains, however, that the circuit court's rejection of his proffered question constitutes plain error. We disagree.

The argument that defendant raises here has been rejected by this court on several previous occasions. See *People v. Buss*, 187 Ill. 2d 144, 180-83 (1999); *People v. Jackson*, 182 Ill. 2d 30, 57-62 (1998); *People v. Brown*, 172 Ill. 2d 1, 29-31 (1996); *People v. Hope*, 168 Ill. 2d 1, 28-31 (1995). Defendant presents no compelling reason to depart from our holdings in these cases and we decline to do so. In light of our prior decisions, we conclude that the circuit court did not err when it declined to ask the prospective jurors defense counsel's proposed question. Accordingly, we also conclude that the circuit court's ruling did not constitute plain error. See *Keene*, 169 Ill. 2d at 17 (all plain errors are reversible errors).

*Jury Instruction on Unanimity*

Illinois Pattern Jury Instructions, Criminal, No. 7C.05 (4th ed. 2000) (IPI Criminal 4th), informs the sentencing jury that a unanimous verdict is required to impose the death penalty. For a defendant who has been convicted of multiple murders, IPI Criminal 4th No. 7C.05 provides:

> "Under the law, the defendant shall be sentenced to death if you unanimously find that there is no mitigating factor sufficient to preclude imposition of a death sentence.
>
> If you are unable to find unanimously that there is no mitigating factor sufficient to preclude imposition of a death sentence, the court will impose a sentence of natural life imprisonment, and no person serving a sentence of natural life imprisonment can be paroled or released, except through an order by the Governor for executive clemency."

Subsequent to the adoption of IPI Criminal 4th No. 7C.05, the General Assembly amended the first degree murder statute. See Pub. Act 93–605, §10, eff. November 19, 2003, amending 720 ILCS 5/9–1(g). The murder statute, which formerly stated that a death sentence shall be imposed if the jury finds "no mitigating factor sufficient to preclude imposition," now states, in pertinent part:

> "(g) Procedure–Jury
>
> *** If the jury determines unanimously, after weighing the factors in aggravation and mitigation, that *death is the*

*appropriate sentence*, the court shall sentence the defendant to death. ***

If after weighing the factors in aggravation and mitigation, one or more jurors determines that *death is not the appropriate sentence*, the court shall sentence the defendant to a term of imprisonment under Chapter V of the Unified Code of Corrections." (Emphases added.) 720 ILCS 5/9–1(g) (West 2004).

Recognizing this change in the statute, the circuit court in the case at bar modified IPI Criminal 4th No. 7C.05 to state:

"Under the law, the defendant shall be sentenced to death if you, after weighing the factors in aggravation and mitigation, unanimously find that death is the appropriate sentence.

If you, after weighing the factors in aggravation and mitigation, are unable to find unanimously that death is the appropriate sentence, the court will impose a sentence of natural life imprisonment, and no person serving a sentence of natural life imprisonment can be paroled or released, except through an order by the Governor for executive clemency."

In addition, the circuit court made similar changes to IPI Criminal 4th No. 7C.06 and the verdict form prescribed by IPI Criminal 4th No. 7C.09A.

At the jury instruction conference, defense counsel did not disagree with the circuit court's replacement of the phrase "no mitigating factor sufficient to preclude imposition" with "death is the appropriate sentence" in the jury instructions and verdict form. Counsel did, however, contend that additional modifications should be made. Counsel argued that the instructions and the verdict form should be further modified to state that, if "*one or more jurors* determines that death is not the appropriate sentence, the Court will impose a sentence of natural life imprisonment." In other words, defense counsel asked the court to modify the instructions and verdict form to track the language found in the second paragraph of the amended version of section 9–1(g) of the murder statute.

The circuit court rejected defendant's additional modification. The court stated:

"The [court's] modification on this instruction and the succeeding instructions are based on a change in the law as set forth in Public Act 093-0605, *** [the modification] most closely parallels the existing I.P.I. with the limited changes to reflect the change in the status of the law.

So, it will be given in form and matter as presented by the People over the Defense objection."

Defendant now contends that the circuit court erred in refusing his proposed modification. Defendant argues that his proposed modification to the instructions and verdict form should have been given because it "more clearly informed the jury that if any juror felt that death was not appropriate, the jury could not sentence [defendant] to death." Defendant maintains that the circuit court's error warrants a new sentencing hearing.

We need not decide whether the circuit court erred by refusing to incorporate the language of the statute in its entirety. Even if we assume, as defendant contends, that the circuit court erred, defendant was not prejudiced by that decision and therefore reversal is not warranted.

Supreme Court Rule 451(a) states, in pertinent part:

"Whenever Illinois Pattern Jury Instructions, Criminal (4th ed. 2000) (IPI Criminal 4th), contains an instruction applicable in a criminal case, giving due consideration to the facts and the governing law, and the court determines that the jury should be instructed on the subject, the IPI Criminal 4th instruction shall be used, unless the court determines that it does not accurately state the law." 210 Ill. 2d R. 451(a).

See also *People v. Simms*, 192 Ill. 2d 348, 412 (2000); *People v. Gilliam*, 172 Ill. 2d 484, 519 (1996). When a pattern jury instruction does not fairly state the law, the circuit court is authorized to modify it. *People v. Hester*, 131 Ill. 2d 91 (1989).

In the case at bar, the circuit court modified the jury instructions and verdict form to reflect what it concluded was a material change in the first degree murder statute, *i.e.*, the replacement of the phrase "no mitigating factor sufficient to preclude imposition" with "death is the appropriate sentence." Defendant does not contest this modification. However, no material change was made in the statute with respect to

-32-

the unanimity requirement; under either version of section 9–1(g), the jury's decision to impose the death sentence had to be unanimous.

A jury instruction is " 'to convey to the minds of the jury the correct principles of law applicable to the evidence submitted to it.' " *People v. Salazar*, 126 Ill. 2d 424, 464 (1988), quoting *People v. Gambony*, 402 Ill. 74, 81-82 (1948). Here, the instructions and verdict form given to the jury properly conveyed the principle that unanimity was required for the imposition of a death sentence. Thus, even if the circuit court erred by not incorporating the language of the statute verbatim, that error had no effect on the outcome of defendant's sentencing hearing. Accordingly, the error was harmless. See, *e.g.*, *People v. Ward*, 187 Ill. 2d 249, 265 (1999) ("An error in a jury instruction is harmless if the result of the trial would not have been different if the proper instruction had been given").

### *Whether Defense Counsel Was Ineffective for Not Presenting Certain Evidence During Mitigation Proceedings*

Throughout both his trial and sentencing proceedings, defendant refused to cooperate with his attorneys in the development and preparation of mitigation evidence. He instructed his family members not to speak with defense counsel and refused to help defense investigators in their efforts to uncover potentially mitigating information. Defendant also refused to undergo any testing with the mitigation specialist appointed by the circuit court, clinical psychologist Dr. Larry Heinrich.

Defendant was admonished by the circuit court on numerous occasions regarding the importance of developing mitigation evidence and the impact his refusal to cooperate with counsel would have on his case. Nevertheless, defendant repeatedly told the court he had no interest in cooperating with either counsel or Heinrich. Defendant stated that he did not want his attorneys to present any mitigation evidence and, more than once, affirmatively waived his right to present mitigation evidence at the sentencing hearing.

Before this court, defendant does not challenge the adequacy of the circuit court's admonishments regarding mitigation or contend that he did not understand the importance of presenting mitigation evidence. Nor does defendant argue that defense counsel failed to

-33-

adequately investigate possible sources of mitigation. Instead, defendant maintains that his attorneys were constitutionally ineffective because they did not introduce into evidence certain medical records which, despite defendant's lack of cooperation, they were able to uncover during the course of their investigation.

The medical records defendant points to are from a hospital in Flint, Michigan. The records indicate that, in June of 1988, defendant suffered head injuries when he was struck by a car, and that in May of 1992, he attempted suicide by leaving a car running in an enclosed garage. Defendant contends that the only reason his attorneys failed to introduce these records was because defendant instructed them not to do so. Defendant further contends, however, that the decision to introduce, or withhold, mitigation evidence is not a decision which is left to a defendant in criminal proceedings. Instead, according to defendant, the decision rests solely with trial counsel as a matter of trial strategy. Because the decision to withhold the medical records in this case was not defendant's to make, defendant maintains that his attorneys' "deference to that decision, and consequent abdication of their authority to make that decision, was substandard performance." Defendant also maintains that the medical records were mitigating and that their omission from the sentencing proceeding was prejudicial. Therefore, defendant contends that his attorneys were constitutionally ineffective.

Defendant's argument that counsel withheld the medical records solely at his request is not supported by the record. On Friday, February 6, 2004, just before the aggravation-mitigation phase of the sentencing hearing was to begin, defense counsel requested a continuance for "one last opportunity" to explain to defendant the effect that his lack of cooperation had on his case. During the course of discussing the request, the circuit court asked counsel to explain for the record what had been done to obtain mitigation evidence. While recounting the efforts that had been made and the difficulties encountered because of defendant's lack of cooperation, counsel for defendant stated:

> "The investigator also *procured documents from several hospitals in Michigan* as well as there were some social service–he was–Mr. Harris had been sentenced previously in Michigan and he was given–he was sentenced to some I guess

you would call it like Haymarket here in Illinois, but some social centers to be evaluated and things like that and we obtained records from those places. There was a psychological evaluation that was part of the discovery and *we tendered all of those materials to the mitigation expert Dr. Heinrich* and we prepared everything that we could outside of the fact that Mr. Harris would not cooperate. He would not take any tests and he made that clear on the record on several occasions." (Emphases added.)

On this same date, the circuit court admonished defendant regarding his right to present mitigating evidence. Defendant formally waived that right. Then, "out of an abundance of caution," the court concluded that it would be appropriate to give defendant the weekend to, once again, consider his decision not to cooperate with his attorney in the preparation of mitigation.

The following Monday, February 9, 2004, defendant was again admonished. As before, defendant affirmatively waived his right to present mitigation evidence during the sentencing hearing. The circuit court then asked defense counsel to again set forth, for the record, what mitigation evidence had been uncovered. Counsel stated:

"The investigator was able to determine there were medical records, *obtained medical records from several hospitals, and locations in the Michigan and Ann Harbor [sic] Flint area.*

There was also records uncovered through the discovery process in regards to several social service outposts that Mr. Harris had been assigned to during the eighties, and on his previous cases we had obtained a mitigation expert report, as one was appointed to this case previously to our appointment, Dr. Larry Heinric[h].

Dr. Heinric[h] did interview the defendant, had a meeting with him, was unable to perform any tests on Mr. Harris, by Mr. Harris' choice not to do that.

*We did give Dr. Heinric[h] all the information that we had uncovered to incorporate into a report.* I met with Dr. Heinric[h] on numerous occasions, went over the report, went over any possible opportunities or areas we could explore

outside of the defendant's lack of cooperation to make that report a mitigating report to be able to present mitigating evidence to the jury or court, whichever we are going to do."

\*\*\*

Whatever was in there we tried to follow-up on, your Honor, and what it led to was hospital records and different things like that, where we were able to, in some cases, find, and other cases we ran into dead ends, *but we did everything we could to get all that information as led to the mitigation expert*, which is all we had at the end." (Emphases added.)

Thereafter, the circuit court stated:

"While we're still outside the presence of the jury and at sidebar, I want to ask the defense, I know that I asked the defendant a series of questions last Friday, as well as this morning, concerning his insistence and desire that you not present any mitigation evidence on his behalf. In fact, he even said he didn't want you to argue for a penalty other than death, but you have indicated in other sidebars, and I want to make this a matter of record, that you also have strategic reasons for your decisions not to present any mitigation evidence, in addition to the defendant's express desire not to have any presented, is that true?

MR. McQUAID [Defense counsel]: That's true.

MR. FAHY [Defense counsel]: That's true, Judge.

THE COURT: Do you want to elaborate on that at all? You don't have to.

MR. McQUAID: Judge, it is just that Dr. Heinric[h], the mitigation specialist, we're in receipt of his report, and we have tendered it to the state's attorney prosecuting this matter, and we have reviewed that, and as a trial lawyer, I see absolutely no mitigation in that report, essentially because my client refused to cooperate with Dr. Heinric[h].

It is just a strategic decision. As a trial lawyer I think it best if you are going to put forth evidence, it be triable evidence and evidence that is persuasive.

-36-

We don't have that, Judge, so we're not going to attempt to just throw something up there that I think would backfire and just become additional aggravation for the State."

From the foregoing, it is clear that defendant's attorneys gave the medical records that defendant asserts should have been introduced at the sentencing hearing to Heinrich, the mitigation specialist. Heinrich prepared a report which incorporated that information, and counsel, for strategic reasons, chose not to present it. Nothing in the record suggests, as defendant contends, that his attorneys withheld the medical records from the sentencing hearing because defendant told them that was what he wanted done.

Moreover, it is apparent from the record why counsel chose not to introduce the medical records. Although the records from 1988 do indicate that defendant suffered serious physical injuries following an automobile accident, there is no indication that defendant suffered any neurological impairment and there is no indication of any causal connection between the injuries and the shootings at the Extra Value liquor store in 1999. Thus, the evidence of physical injury in defendant's medical records from 1988 would have been of no help to counsel in the presentation of his case in mitigation.

As defendant notes, there is a statement in the medical reports from 1992 that defendant had "Bipolar affective disorder, not otherwise specified," and that defendant had "antisocial personality traits." But this diagnosis was made seven years before the shootings at the liquor store in 1999. Because defendant refused to undergo any psychological testing near the time of trial, defense counsel would have had no way to relate the diagnosis in 1992 to defendant's mental health at the time of the sentencing hearing or at the time of the shootings. Thus, again, the evidence of psychological problems in defendant's medical records would have been of no help to counsel.

Further, the medical records from 1992 were, in certain respects, clearly detrimental to defendant. The records state that defendant was depressed at the time of his suicide attempt because, in his words, he was "in big trouble with the law." Defendant did not identify what that trouble was. In addition, the records contain background information regarding defendant which included the following:

"He just got out of jail in June of 1991 and has been on a tether[1] and also on police hold. He was in jail for two years. He was in two auto thefts and some other charges that got him in prison. He was given an option of being in jail for four years or for being in jail for two years and being on a house arrest for two more years. He chose the second one."

Given this information, the 1992 medical records could have been used by the State to reinforce defendant's prior criminal record.

"[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable." *Strickland v. Washington*, 466 U.S. 668, 690, 80 L. Ed. 2d 674, 695, 104 S. Ct. 2052, 2066 (1984). In this case, the medical records at issue contain nothing regarding defendant's physical or mental condition that defense counsel could have used in mitigation and, at the same time, contain information that could have been used by the State in aggravation. In light of this fact, we conclude that counsel's strategic decision to withhold the medical records from the sentencing hearing did not fall below an objectively reasonable standard of care. Accordingly, we reject defendant's claim of ineffective assistance of counsel.

*Constitutionality of the Illinois Death Penalty Statute Under* Apprendi *and* Ring

Defendant argues that the Illinois death penalty statute violates the principles set forth in *Apprendi v. New Jersey*, 530 U.S. 466, 147 L. Ed. 2d 435, 120 S. Ct. 2348 (2000), and *Ring v. Arizona*, 536 U.S. 584, 153 L. Ed. 2d 556, 122 S. Ct. 2428 (2002), because, at the second stage of the sentencing proceedings, the State is not required to prove beyond a reasonable doubt that aggravating factors outweigh the mitigating factors before a death sentence may be imposed. We disagree.

As we recently explained in *People v. Thompson*, 222 Ill. 2d 1, 54 (2006):

---

[1]A "tether" is an electronic home monitoring device. See *People v. Sheets*, 223 Mich. App. 651, 653, 567 N.W.2d 478, 479 (1997).

"[T]he rules announced in *Apprendi* and *Ring* are not applicable to the second phase of a death penalty proceeding in Illinois because the trier of fact has already found beyond a reasonable doubt the necessary aggravating factor for imposition of the death penalty and therefore cannot increase the penalty beyond the statutory maximum of death."

See also *People v. Mertz*, 218 Ill. 2d 1, 93-94 (2005); *People v. Harris*, 206 Ill. 2d 293, 326-27 (2002); *People v. Ballard*, 206 Ill. 2d 151, 202-05 (2002); *People v. Davis*, 205 Ill. 2d 349, 372-75 (2002).

This case illustrates the principle. The jury found defendant eligible for the death penalty after the State proved he had committed two or more murders. At that point, based exclusively on factors proven beyond a reasonable doubt before the jury, defendant faced a statutory maximum sentence of death. The jury's subsequent weighing of aggravating and mitigating circumstances, and its decision that death was the appropriate sentence, did not violate *Apprendi* or *Ring* because it did not increase the maximum penalty already permitted by the jury's finding of death eligibility. Accordingly, we reject defendant's argument on this point.

*Whether the Illinois Death Penalty Statue Is Arbitrarily Applied*

Finally, defendant argues that Illinois' death penalty statute "is arbitrarily applied, based on race, geography, procedural evolution, discretion and mistakes of fact." We have twice previously rejected this same argument. See *Thompson*, 222 Ill. 2d at 54; *Mertz*, 218 Ill. 2d at 95-98. Accordingly, we need not discuss this issue further except to note, as we did in *Thompson*, that defendant does not argue that race, geography or "procedural evolution" actually played any part in the decision to seek or impose the death penalty in his case.

Conclusion

For the foregoing reasons, we affirm defendant's convictions and sentences. The clerk of this court is directed to enter an order setting Wednesday May 9, 2007, as the date on which the sentence of death entered in the circuit court of Cook County, is to be carried out. Defendant shall be executed in the manner provided by law. 725 ILCS 5/119–5 (West 2004). The clerk of this court shall send a certified

copy of the mandate in this case to the Director of Corrections, to the warden of Tamms Correctional Center, and to the warden of the institution where defendant is confined.

*Affirmed.*