THIRD DIVISION
August 8, 2007

No. 1-05-2469

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County |
| | ) | |
| v. | ) | No. 04 CR 4770 |
| | ) | |
| JOSHUA KASZUBA, | ) | Honorable |
| | ) | Thomas R. Sumner, |
| Defendant-Appellant. | ) | Judge Presiding. |

JUSTICE KARNEZIS delivered the opinion of the court:

Following a jury trial, defendant Joshua Kaszuba was convicted of first degree murder (720 ILCS 5/9-1(a)(1) (West 2004)) for his involvement in the shooting death of Eric Cocchia. The trial court sentenced defendant to a total of 45 years' imprisonment; 20 years for first degree murder plus 25 years for personally discharging a firearm that proximately caused Cocchia's death (730 ILCS 5/5-8-1(a)(1)(d)(iii) (West 2004)). Defendant now appeals and argues that the State failed to prove beyond a reasonable doubt that he personally discharged the firearm that proximately caused Cocchia's death.

BACKGROUND

On January 23, 2004, Eric Cocchia and two friends drove to a gas station at Division Street and Noble Street in Chicago. Cocchia's friend Kevin Jeffrey was driving Cocchia's car. While Cocchia was putting windshield washer fluid in his car, he was approached by a male Hispanic person in a white coat with fur around the hood. Cocchia and the person in the white coat had a conversation while Cocchia's friends, Kevin and Jose, waited in the car. It appeared that Cocchia and the person in the white coat knew each other and were having a friendly conversation. Kevin identified the person in the white coat as defendant.

Cocchia got back into the car and Kevin and Jose watched as defendant got into the passenger seat of a red Chevy Lumina. The driver of the Lumina was a dark-skinned man wearing a black coat. Cocchia and his friends left the gas station and Kevin drove to his apartment nearby. They pulled into the parking lot, got out of the car and began walking to the front door of Kevin's apartment building at 1239 North Noble Avenue in Chicago. Kevin saw the same red Lumina from the gas station pass by. Cocchia used the restroom in Kevin's apartment and left.

Francisco Santiago and his three friends were sitting in a car in the parking lot of Kevin's building. As Santiago sat in the backseat of the car, he saw a black Blazer. Santiago saw a man walking toward the car in which he was sitting in. The man passed the car and stopped near a white sport utility vehicle. Santiago then saw a man in a white jacket get out of the Blazer and walk toward the man who had just passed the car

2

in which Santiago was sitting in. Santiago identified the man who stopped near the SUV as Eric Cocchia and the man with the white jacket as defendant.

Santiago's friend, Daniel Rodriguez, was also sitting in the car with Santiago on the night of the shooting. Rodriguez also saw defendant get out of the black Blazer and walk past the car to where Cocchia was standing. Santiago and Rodriguez watched as defendant pulled out a gun, pointed it at Cocchia and searched him. Santiago could hear defendant telling Cocchia that he was going to kill him and Cocchia begging for his life. Santiago then saw defendant shoot Cocchia twice. Rodriguez testified that he saw defendant shoot Cocchia four times. Santiago then watched another male in a black "hoody" exit the Blazer and heard him tell defendant: "[M]ake sure you kill him. Hit him in the head. Hit him in the head." The man in black took the gun from defendant and shot into Cocchia's head.

Kevin looked out his bathroom window, which faced the parking lot, after hearing the gunshots and saw defendant holding a large gun in his hand shooting toward a body as the body lay on the ground. Defendant was wearing the same white coat he had been wearing earlier at the gas station. Kevin also saw another individual with defendant and described that person as having a darker complexion and wearing a black coat with a hood. Kevin ran to the parking lot and saw that the person defendant was shooting at was Cocchia. Cocchia was lying on the ground and was covered in blood. By the time he got outside, defendant was gone.

Erick Arduini lived at 1248 N. Noble in a second-floor apartment on January 23,

3

2004. At approximately 11 p.m. that evening, he heard two gunshots and looked out his front window. From there he saw two people standing in the parking lot. One was wearing a light-colored parka and the other was wearing a dark-colored parka. Arduini saw the person in the light-colored parka holding a gun in his right hand and pointing it toward the ground but was unable to see what he was pointing at. Arduini left the window to call the police, and while he was on the phone, he heard an additional three or four gunshots. Arduini went back to the window and saw the two people still standing there. Before long, the two people ran through the parking lot and headed south. Arduini identified defendant's white coat as the coat he saw defendant wearing on the night of the shooting.

Heidi Anderson lived at 1246 N. Noble on January 23, 2004. At approximately 11 p.m. she heard two gunshots. There was a pause in the gunfire so she ran to her window and looked out. She saw two people, one in a light-colored coat with a fur hood and the other wearing a dark-colored coat standing in the parking lot. She could see the person in the dark-colored coat firing a gun at the ground. She then saw the two men run through the parking lot and head south on Noble.

Ben Vantil lived at 1239 N. Noble on January 23. 2004. At approximately 11 p.m., he heard two gunshots, a pause, and then a second series of gunshots. After the gunshots had concluded, he ran to his window and saw two people, one wearing a white down jacket and the other wearing a black down jacket, standing over another person who was lying next to a white SUV. He could not see anyone's' face from his

third-floor window. Vantil identified defendant's white coat as the light-colored coat he saw on the night of the shooting.

Theophil David Encalado testified before the grand jury. He stated that while defendant was talking to Cocchia in the parking lot, he, Encalado, saw defendant pull out a gun and point it at Cocchia while defendant searched Cocchia. In a handwritten statement he gave to police, Encalado stated that he saw defendant grab Cocchia's jacket with one hand and point the gun at him with the other hand. At trial, Encalado testified that he was driving a black Chevy Blazer on the night of the shooting. Defendant, Encalado's cousin, called him that night and he met defendant and defendant's friend, Mickey Pack, at a park. Later, he dropped defendant and Pack off at a parking lot on Noble and drove away. Two minutes after dropping them off he heard gunfire, so he went back to the parking lot. Defendant and Pack got into the Blazer and Encalado drove away. Despite his testimony before the grand jury and the statement he gave to police, Encalado testified at trial that he never saw defendant with a gun on the evening of the shooting.

Dr. Scott Denton, a forensic pathologist with the Cook County medical examiner's office, testified that he performed the autopsy on Cocchia. Cocchia sustained five gunshot wounds to his head and torso. Dr. Denton opined within a reasonable degree of scientific certainty that Cocchia died from multiple gunshot wounds and the manner of death was homicide.

Defendant was arrested on January 24, 2004. Defendant inculpated himself and

gave both a handwritten statement and a videotaped statement. Defendant stated that on the night of the shooting he was with Pack in Pack's red Chevy Lumina. He and Pack saw Cocchia, whom defendant knew, in the gas station parking lot. He and Pack planned to rob Cocchia and called defendant's cousin Theophil Encalado, who picked defendant and Pack up in his black Chevy Blazer. They drove around until they spotted Cocchia's car. When Cocchia was walking to his car, he and Pack approached Cocchia. Pack handed defendant a gun and he pointed it at Cocchia. Cocchia told them that he had "some weed," so defendant handed the gun back to Pack and took the marijuana from Cocchia's pocket. Defendant and Pack turned to walk away when Pack turned around and started firing the gun at Cocchia. Defendant yelled "[S]top that" and "[W]hat are you doing?" Defendant and Pack then ran back to the Blazer and got inside. Encalado drove away.

The parties stipulated that four bullets recovered from Cocchia's body were fired from the same gun. The parties also stipulated that the police recovered defendant's white jacket and jeans from him at the time of his arrest.

Robert Berk, an expert trace evidence analyst from the Forensic Science Center of Chicago, testified that he received defendant's white jacket and performed a gunshot residue (GSR) test on the sleeves of the jacket. Although he was not able to identify the three unique particles necessary to find a positive test result for GSR, he was able to identify "consistent" GSR particles. The absence of the three unique particles did not prove that defendant did not fire a gun. Berk explained that it was possible to fire a gun

6

while wearing a jacket and not see the particles on the sleeve. Berk further explained that this was possible because of environmental conditions and timing.

After hearing all of the evidence, a jury found defendant guilty of first degree murder. Defendant was sentenced to 45 years' imprisonment. This appeal followed.

ANALYSIS

Defendant contends that the State failed to prove beyond a reasonable doubt that he personally discharged a firearm that proximately caused Cocchia's death. Specifically, defendant contends: (1) the evidence that defendant was present at the scene was questionable; (2) the evidence that the person in the white coat fired a weapon is questionable; and (3) there is no evidence that the shots fired by the person in white coat actually killed the victim. We address each argument in turn.

When a defendant is challenging the sufficiency of the evidence, the relevant inquiry is whether, after viewing all of the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *People v. Smith*, 185 Ill. 2d 532, 541 (1999). The trier of fact is in the best position to determine the credibility of the witnesses, to resolve any inconsistencies or conflicts in their testimony, to assess the proper weight to be given to their testimony and to draw reasonable inferences from all of the evidence. *People v. Cochran,* 323 Ill. App. 3d 669, 679 (2001). A guilty verdict should be given deference and "shall not be disregarded on review unless it is inconclusive, improbable, unconvincing or contrary to human experience." *People v. Schorle*, 206 Ill. App. 3d 748,

7

758 (1990).

Defendant's first argument that there is no evidence that the person in the white coat, *i.e.*, defendant, was present at the scene of the shooting is belied by the record. The record in this case reveals that defendant inculpated himself in a videotaped statement to police. Defendant told police that he was present at the scene but denied firing any shots. Furthermore, several additional witnesses testified that they saw defendant on the evening in question at the scene of the shooting.

Next, defendant contends that the evidence that the person in the white coat fired a weapon is questionable. Defendant asserts that this argument is supported by his statement to police that he did not fire any shots. Defendant also urges that lack of gunshot residue on his coat supports his claim that he did not fire any shots. We disagree.

Defendant admitted that he was at the scene of the shooting and was wearing a white coat. The white coat was recovered from defendant when he was arrested. Several witnesses, including Francisco Santiago, Daniel Rodriguez, Kevin Jeffrey and Eric Arduini, testified that they saw defendant, or a person in a white coat, shooting at Cocchia. Furthermore, as Robert Berk explained, a lack of gunshot residue on defendant's jacket did not necessarily mean that defendant did not shoot a gun. Given that the gun was fired outdoors, the wind could have affected the smoke emitted from the weapon, altering its trajectory so that the smoke did not come in contact with the jacket sleeve. Furthermore, the white jacket was not confiscated until 14 hours after the

shooting which would be a sufficient amount of time for the unique particles that show a positive GSR test to be dislodged from the jacket.

Lastly, defendant claims that even if this court found that there was sufficient evidence indicating that he was at the scene and that he fired the gun, there is no evidence that the shots fired by him killed Cocchia. Interestingly, defendant does not challenge the sufficiency of the evidence supporting his murder conviction but rather argues that the 25-year sentence enhancement was erroneously applied.

The penalty for first degree murder is not less than 20 years' imprisonment and not more than 60 years' imprisonment. 730 ILCS 5/5-8-1(a)(1)(a) (West 2004). The firearm enhancement provision provides:

"(a) Except as otherwise provided in the statute defining the offense, a sentence of imprisonment for a felony shall be a determinate sentence set by the court under this Section, according to the following limitations:

(1) for first degree murder,

* * *

(d) ***

***

(iii) if, during the commission of the offense, the person personally discharged a firearm that proximately caused great bodily harm, permanent disability, permanent disfigurement, or death to another person, 25 years or up to a term of natural life

shall be added to the term of imprisonment imposed by the court."

730 ILCS 5/5-8-1 (a)(1)(d)(iii) (West 2004).

A 25-year sentence enhancement may be added to the sentence for first degree murder provided that it is pled and proved beyond a reasonable doubt. *Apprendi v. New Jersey*, 530 U.S. 466, 490, 147 L. Ed. 2d 435, 455, 120 S. Ct. 2348, 2362-63 (2000). In this case the jury was instructed that the State must prove that during the commission of the murder defendant did one of the following: (1) was armed with a firearm; (2) personally discharged a firearm; or (3) personally discharged a firearm that proximately caused the death of Cocchia. The jury found that during the commission of the offense of first degree murder defendant personally discharged the firearm and defendant personally discharged the firearm that proximately caused Cocchia's death.

Prior to sentencing, defendant filed a motion for a new trial wherein he argued that the State could not proceed on a theory of accountability and a theory that defendant was guilty of first degree murder while armed with a firearm because they were inconsistent theories. In denying defendant's motion, the trial court remarked:

"THE COURT: There was testimony that the defendant shot and then handed off a weapon and the co-defendant shot, but there's no indication as to what shot was fired which turned out to be the fatal shot, but under a theory of accountability, it doesn't matter, and I don't find it to be inconsistent whatsoever. That's not inconsistent.

DEFENSE COUNSEL: Well, you can't be accountable and then found

10

guilty of killing somebody while armed with a weapon, and that 25 years does not attach to an accountability verdict.

THE COURT: Oh, I disagree. But in any event, your motion will be denied."

Despite the court's comments, the State was not required to prove that the bullet or bullets fired by defendant were the exact ones that caused Cocchia's death. As previously stated, the statute allows for the imposition of the 25-year sentence enhancement, in that, when "the person personally discharged a firearm that *proximately* caused great bodily harm, permanent disability, permanent disfigurement, or death to another person, 25 years or up to a term of natural life shall be added to the term of imprisonment imposed by the court." (Emphasis added.) 730 ILCS 5/5-8-1 (a)(1)(d)(iii) (West 2004).

A defendant's criminal acts are the proximate cause of another's death when the acts contribute to that person's death and the death is not caused by an intervening event unrelated to the defendant's acts. *People v. Denkens*, 182 Ill. 2d 247, 260 (1998). In this case, the State presented sufficient evidence that defendant personally discharged a firearm that *proximately* caused Cocchia's death. Kevin Jeffrey testified that he looked out his window and saw defendant standing above a body and shooting at the ground. Francisco Santiago saw defendant pull out a gun and shoot Cocchia twice, causing him to fall to the ground. Daniel Rodriguez testified that he saw the man in the white jacket shoot the man standing by the white SUV four times. Defendant fired

11

two to four shots at Cocchia and struck him. Cocchia fell to the ground and later died from his gunshot wounds. Clearly, the evidence established beyond a reasonable doubt that defendant personally discharged a firearm that proximately caused Cocchia's death. Accordingly, the 25-year sentence enhancement was appropriate.

For the foregoing reasons, the judgment of the trial court is affirmed.

Affirmed.

GREIMAN and CUNNINGHAM, JJ., concur.