SECOND DIVISION

No. 1-07-0586

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County |
| | ) | |
| v. | ) | |
| | ) | |
| JOHN LAVELLE, | ) | Honorable |
| | ) | Marcus R. Salone, |
| Defendant-Appellant. | ) | Judge Presiding. |

JUSTICE KARNEZIS delivered the opinion of the court:

Following a jury trial, defendant John Lavelle was convicted of felony murder (720 ILCS 5/9-1(a)(3) (West 2002)) and was sentenced to 60 years' imprisonment. Defendant was also found to have personally discharged a firearm during the commission of the offense that proximately caused the victim's death and was sentenced to an additional 40 years' imprisonment (730 ILCS 5/5-8-1 (a)(1)(d)(iii) (West 2004)). On appeal, defendant argues: (1) he was denied a fair trial when the State elicited evidence of the victim's family and personal traits designed to arouse the emotions of the jury; (2) counsel was ineffective for failing to request a jury instruction on self-defense; (3) the State failed to prove that defendant personally discharged a

firearm that proximately caused the victim's death during the commission of first degree murder; and (4) his 60-year sentence for felony murder is excessive. For the following reasons, we affirm the judgment of the trial court, but modify defendant's sentence.

BACKGROUND

On May 3, 2002, defendant and codefendants Alexander Valencia, Carlos Santos and Estaban Perkins[1] went to the home of James Smith armed with handguns. James Smith's son Jeffrey suffered gunshot wounds as a result of a shootout that occurred. Two days later Jeffrey died from those gunshot wounds. Defendant and his codefendants were subsequently charged in a 39-count indictment. The State chose to proceed to trial on three counts of felony murder predicated on attempted aggravated kidnapping, attempted residential burglary and attempted aggravated unlawful restraint.

Ortancia Smith testified that on May 3, 2002, at approximately 9:30 p.m., she heard someone pounding on the living room window. She heard her brother Jeffrey say, "James [*sic*] not here." She heard more pounding on the window and went upstairs to her bedroom to look out the window. She saw a Jeep Cherokee parked in front of the house with its lights on. She met Jeffrey at the top of the stairs and saw him go into a closet. She then followed Jeffrey downstairs and looked out the living room window. She saw two men standing there holding guns. One of the men she recognized as Carlos Santos, a man that had come to the house looking for her father. She yelled at Jeffrey not to open the door. She did not see anything in Jeffrey's hands.

---

[1]Codefendants Valencia, Santos and Perkins are not parties to this appeal.

2

Jeffrey opened the door.

Ortancia heard gunshots and saw Jeffrey fall backwards. Jeffrey was bleeding from the side of his neck. She put pressure on his wound and called an ambulance.

Ortancia spoke to detectives twice about the incident. The second time, she told detectives that Jeffrey had a gun. She also viewed a photo line-up at the police station and positively identified Carlos Santos as one of the people she saw outside her home. She also stated that in the week prior to the shooting she saw defendant at her house at least twice looking for her father. Later, she identified Alex Valencia as a person who had come to her home on previous occasions looking for her father.

Tanya Jeffries testified that she and Jeffrey Smith had a son together and that she was at Jeffrey's house on May 3, 2002. At about 9:30 p.m. she heard a knock on the living room window and looked out. She saw three or four men standing on the porch. Tanya told Jeffrey what she saw and Jeffrey went upstairs.

When Jeffrey came back downstairs Tanya asked the men, through the window, what they wanted. They stated that they wanted to know if James was home. Tanya told them that James wasn't there. Tanya heard Ortancia tell Jeffrey that the men had guns. Jeffrey told Tanya to call the police so Tanya called 911. She then heard gunshots. When she walked to the door she saw Jeffrey lying on the ground bleeding.

Tanya testified that subsequent to the shooting she identified a photo of Carlos Santos. Tanya also testified that she did not see Jeffrey with a gun.

The parties stipulated that, if called to testify, Deputy Cook County Medical

3

Examiner Dr. Kendall Crowns would testify that the cause of Jeffrey Smith's death was a gunshot wound to the chest and the manner of death was homicide. There was no evidence of close range firing.

Sergeant Anthony Wojcik of the Chicago police department was present at the scene of the crime. Sergeant Wojcik was notified that Jeffrey Smith was taken to the hospital and was in critical condition.

Sergeant Wojcik spoke with James Smith at Area 5 headquarters. After speaking with James Smith, Sergeant Wojcik began a search for Carlos Santos and Alexander Valencia. Sergeant Wojcik also spoke with Ortancia and Tanya separately. Both women identified Carlos Santos from a photo array. The next day, Sergeant Wojcik learned that Jeffrey died from his wounds.

Carlos Santos was arrested on May 14, 2002. Alexander Valencia was arrested on May 15, 2002. Following these arrests, Sergeant Wojcik went in search of "Big John," a Cook County correctional officer who worked security at J&J Sound Shop on the south side.

On May 16, 2002, Sergeant Wojcik and other detectives planned a "sting" operation where an undercover officer would meet with defendant and bring him $8,000 in marked currency in two separate bags as payment for his involvement in the shooting that led to Jeffrey's death. Sergeant Wojcik and the other detectives planned to video tape and audio record this meeting.

At 8 p.m. on May 16, 2002, Investigator Hernandez, acting undercover, met with

4

defendant at a Burger King restaurant. Defendant approached Investigator Hernandez's table and the two men spoke. Defendant was arrested outside the Burger King and detectives recovered two loaded handguns, each with three magazines. Defendant was wearing a bulletproof vest and had his Cook County Sheriff's identification and badge. Defendant also had two separate bags, with $4,000 in each, containing the marked money. At the police station, defendant signed a consent to search his home.

Officers subsequently searched defendant's home. A Glock 21 weapon was found in a dresser in the master bedroom, along with three magazines and live rounds. The weapon had been dismantled and the barrel of the gun was not found in the dresser.

Defendant executed a handwritten statement in the presence of Assistant State's Attorney Arunas Buntinas, which was admitted into evidence and published to the jury. In the statement he acknowledged that he waived his *Miranda* rights. Defendant stated that he was a deputy sheriff correctional officer assigned to 26th and California. He also worked part-time as a security guard at J&J Electronics on south State Street. He had known Alex Valencia for about a year.

On May 3, 2002, Valencia spoke with defendant at J& Electronics and told him that he needed help collecting money from a person. Defendant told Valencia to meet him at another J&J Electronics store at 8p.m. and that he would bring Esteban Perkins, another Cook County correctional officer. Valencia told defendant that he would pay

defendant and Perkins $5,000 each.

Defendant went to the other J& Electronics located at 63rd and Spaulding in Chicago, and met Valencia and Santos. They planned to go to James Smith's home to collect the money. If Smith did not come to the door with the money, they planned to go inside the house and get the money and make sure that the man did not have a gun. If Smith did not have the money, they would take him from the house.

Defendant, Santos and Perkins walked onto the porch of James's house and Santos knocked on the window. A voice from inside asked what they wanted and Santos asked for James Smith. Jeffrey then answered the door holding a big gun in his hand. Perkins turned and ran, while defendant and Santos backed down the stairs.

Jeffrey then began shooting. Defendant and Santos ran and took cover behind some parked cars. Defendant fired one shot at Jeffrey. They all fled the scene. They went to a Chinese restaurant and defendant and Perkins were paid $1,000 for their participation.

Defendant used his Glock, a semiautomatic weapon that fires .45-caliber bullets, to fire at Jeffrey. Several days after the shooting, he took the barrel out of the gun and ground it down with an electric grinding wheel until the barrel disintegrated.

Kurt Murray, a forensic scientist with the Illinois State Police, and also an expert in the field of firearm and tool mark examination, testified that he examined a fired .45-caliber bullet recovered from the medical examiner's office and determined that it was fired from either a Glock Model 21 or a Glock Model 30, both semiautomatic pistols.

6

Murray received seven discharged casings in total: six .10-millimeter caliber casings and one .45-caliber casing. Murray found that the .10-millimeter casings were fired from a different gun than the .45-caliber casing. Therefore, he concluded that there were at least two different firearms used.

Murray received the Glock 21 recovered from defendant's home and as well as some unfired .45-caliber cartridges. Some of the unfired cartridges were the same brand as the .45-caliber cartridges found at the scene. The Glock 21 was in pieces and was missing its barrel. In order to test the gun, he obtained a compatible barrel from the Rockford Illinois State Police forensic laboratory. After conducting firing tests with the replacement barrel, Murray testified that the .45-caliber cartridge case recovered from the scene was fired from the reconstructed Glock 21. However, he would not state with certainty whether the .45-caliber bullet recovered from the medical examiner's office had been fired from the Glock 21 due to the fact that the Glock 21 was missing its barrel.

Defendant's testimony was generally consistent with his statement. Defendant testified that Valencia asked him to act as security for $5,000. Defendant claimed that he was told that the collection of money had nothing to do with guns or drugs. Defendant stated that he was dressed in jeans with a zipper front sweatshirt, which covered his vest. Neither his vest, weapon nor badge was visible. Defendant also testified that when he and the other men approached the Smith house and were told that James was not home, he and Perkins started to turn away from the house.

Defendant further testified that when Jeffrey answered the door with the gun, he feared for his life so he put his hands in the air and told Jeffrey that they were leaving and not to do anything stupid. After defendant and Santos ran away, they heard Jeffrey shoot the gun. He continued to run and hid behind a car. He thought if he fired a round at Jeffrey, Jeffrey would go back into the house and they could get away. Both he and Santos fired a shot at Jeffrey. They fled and later Valencia, Perkins and defendant were dropped off at a laundromat where they were met by some individuals who gave defendant and Perkins $1,000 apiece.

Defendant also testified that on May 16, 2002, he went to a Burger King restaurant to meet a man whom he thought was Valencia's uncle. He went there to collect the remainder of the money promised to him and Perkins for acting as "security." Defendant told the undercover officer that no one was supposed to get hurt and that he did not want to have anything to do with picking up drugs. When he left Burger King, he was arrested.

While being transported, defendant asked for a lawyer. Sergeant Wojcik told him it was not necessary. Sergeant Wojcik told defendant that he had nothing to worry about, that the detectives were really after Santos and Valencia. After being placed in an interview room, defendant again asked for a lawyer. Sergeant Wojcik told him that there was nothing they could do for defendant if he got a lawyer involved. After making several phone calls, defendant agreed to help the police. Defendant learned from Sergeant Wojcik that Santos and Valencia had planned on breaking into Smith's house,

8

restraining him and possibly kidnapping him. Defendant testified that he was unaware of the plan and at no time did anyone try to break into Smith's home. Defendant also testified that he was unaware that the purpose of the visit was to collect a drug debt.

The State called Sergeant Wojcik in rebuttal. Sergeant Wojcik testified that defendant never asked for an attorney during transport or at the station. Sergeant Wojcik further testified that he did not make a deal with defendant in return for his cooperation and never informed defendant about the facts of the case or what Santos or Valencia had told him. Defendant told Sergeant Wojcik that this was all about collecting a drug debt.

After hearing all of the evidence, the jury found defendant guilty of felony murder and also found that the defendant personally discharged a firearm during the course of the first degree murder that proximately caused the death of Jeffrey Smith. Defendant was sentenced to 60 years' imprisonment for murder with a 40-year sentence enhancement for a total of 100 years' imprisonment. It is from this judgment that defendant now appeals.

ANALYSIS

Improper Evidence

Defendant first argues that he was denied a fair trial when the State elicited evidence of the decedent's family and his personal traits, which was wholly designed to arouse the emotions of the jury and resulted in prejudice to defendant.

Defendant first contends it was error when Sandra Smith, Jeffrey Smith's

mother, testified that she had eight children ranging from 32 years old to 10 years old. On the day that Jeffrey was shot, five of the children were living with her, including Jeffrey, Jeffrey's girlfriend Tanya and their children. Sandra Smith also testified that when she last saw Jeffrey, he was in the living room watching TV with Tanya and his children. Jeffrey walked Sandra to her car when she was leaving and she left him laughing and talking with the neighbors.

Defendant also objects to Ortencia's testimony regarding who was living in the house on the day of the shooting. Ortencia testified that five of her siblings, in addition to Jeffrey's girlfriend Tonya, and their children were living in the house on the day of the shooting. Ortencia also testified that on the day of the shooting she came home from work and went upstairs to change her clothes and talked to Jeffrey for about 20 minutes. Jeffrey hugged her and told her that he loved her. She also testified that on the evening of his death, Jeffrey was laughing and playing with his children.

The State argues, and we agree, that defendant has forfeited review of this issue by failing to object at trial and failing to include this issue in his posttrial motion. *People v. Enoch*, 122 Ill. 2d 176, 186 (1988). However, defendant urges us to consider this issue for plain error.

The plain error doctrine is best outlined in *People v. Herron*, 215 Ill. 2d 167, 186-87 (2005).

"[w]e reiterate: the plain-error doctrine bypasses normal forfeiture principles and allows a reviewing court to consider unpreserved error when either

(1) the evidence is close, regardless of the seriousness of the error, or (2) the

error is serious, regardless of the closeness of the evidence. In the first instance,

the defendant must prove 'prejudicial error.' That is, the defendant must show

both that there was plain error and that the evidence was so closely balanced

that the error alone severely threatened to tip the scales of justice against him.

The State, of course, can respond by arguing that the evidence was not closely

balanced, but rather strongly weighted against the defendant. In the second

instance, the defendant must prove there was plain error and that the error was

so serious that it affected the fairness of the defendant's trial and challenged the

integrity of the judicial process." *Herron*, 215 Ill. 2d at 186-87.

However, before considering plain error, we must first consider whether error

occurred at all. *People v. Harris*, 225 Ill. 2d 1, 31 (2007).

In *Harris*, our supreme court considered whether error occurs when life and

death witnesses testify as to the deceased's family.

" ' "[W]here testimony in a murder case respecting the fact the deceased

has left a spouse and family is not elicited incidentally, but is presented in such a

manner as to cause the jury to believe it is material, its admission is highly

prejudicial and constitutes reversible error unless an objection thereto is

sustained and the jury instructed to disregard such evidence. In like manner, we

have held that jury argument by the prosecution which dwells upon the

decedent's family or seeks to relate a defendant's punishment to the existence of

11

family is inflammatory and improper. [Citations.]" ' " *Harris*, 225 Ill. 2d at 32,

quoting *People v. Hope*, 116 Ill. 2d 265, 275 (1986), quoting *People v. Bernette*,

30 Ill. 2d 359, 371 (1964).

However, the *Harris* court noted that murder victims do not live in a vacuum. *Harris*, 225 Ill. 2d at 32, citing *People v. Free*, 94 Ill. 2d 378, 415 (1983). Therefore, every mention of a deceased's family does not automatically entitle the defendant to a new trial. *Harris*, 225 Ill. 2d at 30-31, citing *Hope*, 116 Ill. 2d at 276.

Neither Sandra's nor Ortencia's testimony was error. Both testified as to who was present in the home and to the events of the evening prior to the shooting. This testimony came in response to procedural background questions, which had no bearing on defendant's guilt or innocence. Their testimony was properly admitted as life and death testimony. *Harris*, 225 Ill. 2d at 32.

Next, defendant claims that the comments made by the State in closing argument regarding Jeffrey's character and the fact that he was at home with his family when defendant and others arrived was error. During closing argument, the prosecutor may properly comment on the evidence presented or reasonable inferences drawn from that evidence, respond to comments made by defense counsel which clearly invite response, and comment on the credibility of witnesses. *People v. Rader*, 178 Ill. App. 3d 453, 466 (1988). In reviewing whether comments made during closing argument are proper, the closing argument must be viewed in its entirety and remarks must be viewed in context. *People v. Kitchen*, 159 Ill. 2d 1, 38 (1994). In this case it cannot be

said that the State's comments were outside the bounds afforded to prosecutors in making closing arguments.

Ineffective Assistance

Defendant next argues that trial counsel was ineffective for failing to request Illinois Pattern Jury Instructions, Criminal (4th ed. 2000), No. 24-25.09 (hereinafter IPI Criminal 4th). IPI 4th Criminal No. 24-25.09 states:

"24-25.09 Initial Aggressor's Use of Force

A person who initially provokes the use of force against himself is justified in the use of force only if

[1] the force used against him is so great that he reasonably believes he is in imminent danger of death or great bodily harm, and he has exhausted every reasonable means to escape the danger other than the use of force which is likely to cause death or great bodily harm to the other person.

[or]

[2] in good faith, he withdraws from physical contact with the other person and indicates clearly to the other person that he desires to withdraw and terminate the use of force, but the other person continues or resumes the use of force."

To prevail on a claim of ineffective assistance of counsel, a defendant must satisfy the two prong test set forth in *Strickland v. Washington*, 466 U.S. 668, 687, 80 L. Ed. 2d 674, 693, 104 S. Ct. 2052, 2064(1984). A defendant must show that (1) trial

13

counsel's representation fell below an objective standard of reasonableness, and (2) he was prejudiced by the deficient performance. *Strickland*, 466 U.S. at 687, 80 L. Ed. 2d at 693, 104 S. Ct. at 2064; *People v. Albanese*, 104 Ill. 2d 504, 525 (1984). Where the defendant fails to prove prejudice, the reviewing court need not determine whether counsel's performance constituted less than reasonable assistance. *Strickland*, 466 U.S. at 697, 80 L. Ed.2d at 699, 104 S. Ct. at 2069; *People v. Flores*, 153 Ill. 2d 264, 284 (1992). The defendant bears the burden of overcoming a strong presumption in favor of finding that counsel's advocacy was effective. *Albanese*, 104 Ill. 2d at 525.

Under normal circumstances, self-defense cannot be asserted as a defense to felony murder. *People v. Moore*, 95 Ill. 2d 404, 411 (1983). The rationale for prohibiting a defendant from asserting self-defense to a felony-murder charge is that "an individual cannot claim that he was provoked by a person against whom he has already committed or attempted to commit a forcible felony. " *People v. Williams*, 164 Ill. App. 3d 99, 109 (1987). Therefore, "a defendant cannot raise a justification defense if he or she sets into motion a course of felonious conduct.*" People v. Luckett,* 339 Ill. App. 3d 93, 100 (2003), citing *People v. Mills*, 252 Ill. App. 3d 792, 799 (1993); See also 720 ILCS 5/9 (a)(3), 7-4(a) (West 2002).

At the instructions conference, defense counsel requested that the jury be instructed using IPI Criminal 4th No. 24-25.06, which reads:

"A person is justified in the use of force when and to the extent that he

reasonably believes that such conduct is necessary to defend [(himself)

(another) ] against the imminent use of unlawful force.

[However, a person is justified in the use of force which is intended or likely to cause death or great bodily harm only if he reasonably believes that such force is necessary to prevent [ (imminent death or great bodily harm to [(himself) (another) ] ) (the commission of _____) ].]" IPI Criminal 4th No. 24-25.06.

The trial court denied defense counsel's request for IPI Criminal 4th No. 24-25.06.

We cannot say that defendant suffered any prejudice as a result of defense counsel's failure to request IPI Criminal 4th No. 24-25.09.   First, there is no evidence that had defense counsel requested IPI Criminal 4th No. 24-25.09 that the trial court would have allowed it given that the court denied defendant's request for IPI Criminal 4th No. 24-25.06.  In addition, IPI Criminal 4th No. 24-25.09 cannot be given without IPI Criminal 4th No. 24-25.06.

In *People v. Chatman*, 381 Ill. App. 3d 890 (2008), the court found error where IPI Criminal 4th No. 24-25.09 was submitted to the jury without IPI Criminal 4th 24-25.06.  The court reasoned:

"The jury was given an impossible truncated understanding of self-defense in that IPI Criminal 4th No. 24-25.09 was not accompanied by IPI Criminal No. 24.25.06.  IPI Criminal 4th No. 24-25.09 is subject to a predicate fact, that defendant was the initial aggressor.  IPI Criminal 4th No. 24-25.09 includes

15

no alternative standard of self-defense to be applied if the predicate is absent; rather, the predicate is stated as a given. Where IPI Criminal 4th No. 24-25.09 is submitted without IPI Criminal 4th No. 24-25.06 (the default or basic standard of self-defense), the jury is compelled to assume that the defendant was the initial aggressor and therefore had a diminished right of self-defense."

*Chatman*, 381 Ill. App. 3d at 901.

According to *Chatman*, even if defense counsel had requested IPI Criminal 4th No. 24-25.09, it would have been error to give IPI Criminal 4th No. 24-25.09 without IPI Criminal 4thNo. 24-25.06. Therefore, defendant suffered no prejudice as a result of defense counsel's failure to request IPI Criminal 4th No. 24-25.09.

Proximate Cause

Defendant next claims that the State failed to prove that he fired the shots that killed Jeffrey Smith. Defendant does not challenge the sufficiency of the evidence supporting his murder conviction, but rather argues that the State failed to prove beyond a reasonable doubt that he personally discharged a firearm that proximately caused Jeffrey's death. Defendant claims that the 40-year sentence enhancement must be vacated.

When a defendant is challenging the sufficiency of the evidence, the relevant inquiry is whether, after viewing all of the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *People v. Smith*, 185 Ill. 2d 532, 541 (1999). The

16

trier of fact is in the best position to determine the credibility of the witnesses, to resolve any inconsistencies or conflicts in their testimony, to assess the proper weight to be given to their testimony and to draw reasonable inferences from all of the evidence. *People v. Cochran,* 323 Ill. App. 3d 669, 679 (2001).

The penalty for first degree murder is not less than 20 years' imprisonment and not more than 60 years' imprisonment. 730 ILCS 5/5-8-1(a)(1)(a) (West 2004). However, subsection (iii) of section 5-8-1 of the Unified Code of Corrections (the Code), also known as the firearm enhancement provision,  provides:

> "(a) Except as otherwise provided in the statute defining the offense, a sentence  of imprisonment for a felony shall be a determinate sentence set by the court under this Section, according to the following limitations:
>
> > (1) for first degree murder,
>
> > > * * *
>
> > (d) ***
>
> > ***
>
> > > (iii) if, during the commission of the offense, the person personally discharged a firearm that proximately caused great bodily harm, permanent disability, permanent disfigurement, or death to another person, 25 years or up to a term of natural life shall be added to the term of imprisonment imposed by the court."
>
> 730 ILCS 5/5-8-1 (a)(1)(d)(iii) (West 2004).

A sentence enhancement may be added to the sentence for first degree murder

17

provided that it is pled and proved beyond a reasonable doubt. *Apprendi v. New Jersey*, 530 U.S. 466, 490, 147 L. Ed. 2d 435, 455, 120 S. Ct. 2348, 2362-63 (2000). In this case the jury was instructed that the State must prove that during the commission of the murder defendant personally discharged a firearm that proximately caused Jeffrey's death. The jury found that during the commission of the offense of first degree murder, defendant personally discharged the firearm and defendant personally discharged the firearm that proximately caused Jeffrey's death.

The State argues that the evidence in this case was sufficient to establish that defendant personally discharged a firearm that *proximately* caused Jeffrey's death. In support, the State cites *People v. Kaszuba*, 375 Ill. App. 3d 262 (2007). In *Kaszuba,* the defendant argued that the 25-year sentence enhancement should be vacated where the State failed to prove beyond a reasonable doubt that he personally discharged a firearm that proximately caused the victim's death. This court found that sufficient evidence existed, through the testimony of several witnesses, to support the finding that defendant personally discharged a firearm that proximately caused the victim's death. Specifically:

> "Kevin Jeffrey testified that he looked out his window and saw defendant standing above a body and shooting at the ground. Francisco Santiago saw defendant pull out a gun and shoot Cocchia twice, causing him to fall to the ground. Daniel Rodriguez testified that he saw the man in the white jacket shoot the man standing by the white SUV four times. Defendant fired two to four shots at Cocchia and struck him. Cocchia fell to the ground and later died from his

18

gunshot wounds." *Kaszuba*, 375 Ill. App. 3d at 268.

The State argues that similar to *Kaszuba,* there is evidence in this case that defendant personally discharged a firearm that proximately caused Jeffrey's death beyond a reasonable doubt. Defendant admitted that he used his Glock handgun to fire at Jeffrey. A discharged .45-caliber automatic cartridge case recovered from the scene was determined to have been fired from defendant's weapon. Defendant then destroyed the barrel of that weapon so that his gun could not be linked to the shooting. At oral argument, the State suggested that it was permissible to infer from this evidence that the bullet fired from defendant's gun was the proximate cause of Jeffrey's death.

We disagree. Unlike *Kaszuba*, the evidence in this case does not clearly establish that defendant's gunshot was the proximate cause of Jeffrey's death. First, defendant testified that both he and Santos fired shots at Jeffrey. Although there was some evidence in *Kaszuba* that another person may have fired the gun at the victim in an attempt to make sure the victim died, numerous witnesses testified that it was the defendant who stood over the victim's body and fired numerous shots. Although a .45 casing that was found at the scene was determined to have been fired from defendant's Glock, it could not be determined with certainty whether the bullet recovered from Jeffrey's body was fired from defendant's Glock, due to the fact that the gun no longer had a barrel. In *Kaszuba*, it was stipulated that the four bullets recovered from the victim's body were fired from the same gun. It was opined in this case that the bullet recovered from Jeffrey's body could have been fired from two types of weapons, one of which was the Glock 21, the same kind recovered from defendant's home. There was

19

no evidence offered by either party as to what kind of gun Santos discharged at the scene. Given the facts of this case, without evidence as to what kind of gun Santos discharged, it is impossible to determine whether defendant or Santos personally discharged a firearm that proximately caused Jeffrey's death. Viewing the evidence in the light most favorable to the State, we find the 40-year sentence enhancement inappropriate.

Nevertheless, there is no doubt in this case that defendant personally discharged a firearm during the commission of felony murder. Defendant admitted to firing his weapon at Jeffrey in his written statement and testified as such in open court. Subsection (ii) of section 5-8-1(a) of the Code allows for the imposition of a 20-year sentence enhancement when the defendant personally discharges a firearm during the commission of felony murder.

> "(a) Except as otherwise provided in the statute defining the offense, a sentence of imprisonment for a felony shall be a determinate sentence set by the court under this Section, according to the following limitations:
>
>> (1) for first degree murder,
>>
>> * * *
>>
>> (d) ***
>>
>>> (ii) if, during the commission of the offense, the person personally discharged a firearm, 20 years shall be added to the term of imprisonment imposed by the court. 730 ILCS 5/5-8-1

(a)(1)(d)(ii) (West 2004).

As we have the authority to reduce a criminal sentence (*People v. Jones*, 168 Ill. 2d 367, 378 (1995)), we reduce defendant's 40-year sentence enhancement imposed pursuant to subsection (iii) of section 5-8-1(a) of the Code  to a 20-year sentence enhancement pursuant to subsection (ii) of section 5-8-1(a) of the Code.

Sentencing

Last, defendant argues that the court abused its discretion when it sentenced him to 60 years' imprisonment for felony murder.  Specifically, defendant claims that the court improperly relied on facts not in evidence when it stated that defendant was a cold and calculated paid killer with no remorse who betrayed the public's trust.   Defendant also claims that the court improperly considered that defendant upped the price after Jeffrey was shot, a fact not in evidence, to impose a 100-year sentence.

It has long been established that the trial court has broad discretionary powers in choosing the appropriate sentence a defendant should receive. *People v. Jones*, 168 Ill. 2d 367, 373-74 (1995).   A reasoned judgment as to the proper sentence to be imposed must be based upon the particular circumstances of each individual case and depends upon many factors, including the defendant's credibility, demeanor, general moral character, mentality, social environment, habits and age. *People v. Perruquet*, 68 Ill. 2d 149, 154 (1977).   The imposition of a sentence is a matter within the trial court's discretion. See *Jones*, 168 Ill. 2d at 374. Where the sentence chosen by the trial court is within the statutory range permissible for the criminal offense for which the defendant

21

has been tried and convicted, a reviewing court has the power to disturb the sentence only if the trial court abused its discretion in the sentence it imposed. *Jones*, 168 Ill. 2d at 374.

The defendant's history, character, and rehabilitative potential, the seriousness of the offense, the need to protect society and the need for deterrence and punishment are all factors to be considered in fashioning a sentence. *People v. Jones*, 295 Ill. App. 3d 444, 455, 692 N.E.2d 762, 770 (1998). There is a strong presumption that the trial court based its sentencing determination on proper legal reasoning, and the court is presumed to have considered any evidence in mitigation which is before it. *People v. Partin*, 156 Ill. App. 3d 365, 373, 509 N.E.2d 662, 666-67 (1987).

As previously stated, defendant was sentenced to a total of 100 years' imprisonment; 60 years' imprisonment as to the felony murder counts with an additional 40 years' imprisonment as an extended term pursuant to subsection (a)(1)(d)(iii) of section 5/5-8-1. 730 ILCS 5/5-8-1 (a)(1)(d)(iii) (West 2004). We have reduced the sentence enhancement to 20 years for a total of 80 years' imprisonment.

The trial court did not abuse its discretion in imposing sentence for felony murder in this case. While the court may have considered a fact not in evidence in imposing sentence, the record reveals that the court reviewed the factors in aggravation and mitigation, as well as considering the arguments of counsel and the defendant's statement of elocution. Taking all of that into consideration, the court found that 60 years' imprisonment was the appropriate sentence for felony murder given that defendant betrayed public trust by using his position in law enforcement and by

22

destroying evidence.  The trial court was well within its discretion when it imposed this sentence.  Any reliance on a fact not in evidence was harmless.   We find no abuse of discretion here.

Based on the foregoing, the judgment of the trial court is affirmed and defendant's sentence is modified.

Affirmed; sentence modified.

HOFFMAN and THEIS, J.J., concur.

1-07-0586

REPORTER OF DECISIONS - ILLINOIS APPELLATE COURT

---

THE PEOPLE OF THE STATE OF ILLINOIS,

        Plaintiff-Appellee,

        v.

JOHN LAVELLE,

        Defendant-Appellant.

---

No. 1-07-0586

Appellate Court of Illinois
First District, Second Division

November 17, 2009

---

JUSTICE KARNEZIS delivered the opinion of the court.

HOFFMAN and THEIS, J.J., concur.

---

Appeal from the Circuit Court of Cook County.

The Honorable Marcus Salone, Judge Presiding.

---

For APPELLANT, Donna Hickstein-Foley, Foley & Foley, of counsel.

For APPELLEE, Anita Alvarez, State's Attorney of Cook County (James E. Fitzgerald, Mary P. Needham, and William C. Swallow, of counsel)